UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| BN HOLDINGS TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ALAN H. GINSBURG;<br>JOHN DOES 1-10;<br>DOE LAW FIRM 1-2; and<br>DOE AUDITORS 1-2,<br><br>Defendants. | Civil Action No.: 25-CV-2018 |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**CONTENTS**

**TABLE OF AUTHORITIES** ........ 3

I. **PRELIMINARY STATEMENT** ........ 4

**II. JURISDICTION & VENUE** ........ 6

**III. PARTIES AND FACTS** ........ 7

**IV. CLAIMS FOR RELIEF** ........ 18

**V.CONCLUSION** ........ 24

# TABLE OF AUTHORITIES

**Cases**

AES Corp. v. Dow Chemical Co., 325 F.3d 174 (3d Cir. 2003); ........ 16
Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972) ........ 21
Agar Corporation, Inc. v. Electro Circuits International, LLC, 580 S.W.3d 136, 141-142 (Tex. 2019)........ 21
Basic Inc. v. Levinson, 485 U.S. 224 (1988) ........ 5
Cyan, Inc. v. Beaver County Employees Retirement Fund, 138 S. Ct. 1061 (2018), ........ 16
Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), ........ 18
First Bank of the Americas v. Motor Car Funding, Inc., 257 A.D.2d 287 (N.Y. App. Div. 1999). ........ 19
Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc., 960 S.W.2d 41 (Tex. 1998) ........ 19
Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323 (Tex. 2011). ........ 16
Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135 (2011). ........ 17
Juhl v. Airington, 936 S.W.2d 640 (Tex. 1996) ........ 19
Macquarie Infrastructure Corp. v. Moab Partners, L. P., 601 U.S. ___ (2024) ........ 14
Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011) ........ 11
SEC v. Cavanagh, 155 F.3d 129 (2d Cir. 1998) ........ 15
SEC v. Tambone, 597 F.3d 436 (1st Cir. 2010) ........ 18
SEC v. W.J. Howey Co., 328 U.S. 293 (1946) ........ 6
Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), ........ 4
Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005) ........ 21

**Statutes**

15 U.S.C. § 78aa ........ 6
28 U.S.C. § 1332 ........ 6
28 U.S.C. § 1391(b)(2) ........ 6
PSLRA ........ 4
Sarbanes-Oxley ........ 16
Section 10(b) of the Securities Exchange Act ........ 4, 20
Section 27 of the Securities Exchange Act of 1934 ........ 6
Section 29(a) of the Securities Exchange Act ........ 5
Sections 10(b), 13(a), 13(b)(2), and 13(b)(5) and of the Securities Exchange Act of 1934 ........ 13
Securities Act of 1933 ........ 17
Texas Business Organizations Code § 101.502 ........ 16

COME NOW, **BN HOLDINGS TRUST ("Plaintiff")** by undersigned counsel, and complain of **ALAN H. GINSBURG, JOHN DOES 1-10, AND DOE LAW FIRMS 1-2, AND DOE AUDITORS 1-2** as follows:

## I. PRELIMINARY STATEMENT

1. Plaintiff is a Nevada Trust with its legal address and residency in Chambers County, Texas, and may be served with process through its Attorney of Record, Morris Legal Corp.
2. This action arises from a sophisticated and deliberate fraudulent scheme orchestrated by Defendant Alan H. Ginsburg and his co-conspirators in violation of federal securities laws, including Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. Through a series of material misrepresentations, intentional omissions, and unlawful transfers of beneficial ownership, Defendant Ginsburg, a sophisticated investor and purported managing member of GLD Sponsor Member, LLC, deliberately concealed both a material change in control and the central involvement of Daniel L. Gordon, a convicted felon and SEC-barred securities violator, in Sagaliam Sponsor, LLC and its affiliate, Sagaliam Acquisition Corp. ("SAGA"), a publicly traded SPAC. As clarified by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), Ginsburg's actions demonstrate intent or severe recklessness, meeting the scienter requirement of the Private Securities Litigation Reform Act of 1995.
3. Plaintiff entered into a Membership Interest Purchase Agreement on March 31, 2023 (Exhibit 1), based on express representations that Ginsburg retained lawful control of the Sponsor and that the shares and interests were validly held and transferable. In truth, Ginsburg had already transferred beneficial ownership to Gordon in violation of SAGA's governing documents, SEC rules, and the express transfer restrictions disclosed in SAGA's S-1/A registration

statement. The Plaintiff was not informed of the transfer nor of Gordon's background, which included a criminal conviction for financial fraud, SEC sanctions, and a tax warrant in excess of $50 million. Plaintiff's reliance on these misrepresentations was reasonable as articulated in Basic Inc. v. Levinson, 485 U.S. 224 (1988), given the reliance on public filings and reputational trust in Ginsburg, a public figure with an impressive business background.

4. Further compounding the fraud, the transfer of control and changes in beneficial ownership were not timely or lawfully reported to the SEC as required under federal securities regulations. The Plaintiff reasonably relied on the representations made by Ginsburg and was never provided access to the Sponsor Member's governing documents, financial records, or material disclosures concerning Gordon's control and involvement.

5. After the closing, Plaintiff discovered that Defendants had deliberately structured the transaction to fraudulently transfer millions of dollars in undisclosed liabilities to Plaintiff, while simultaneously attempting to insulate themselves from liability through a strategically inserted release provision in a subsequent amendment. This release provision is void as a matter of law under Section 29(a) of the Securities Exchange Act, which explicitly prohibits waivers of compliance with federal securities laws, and is separately unenforceable under both New York and Texas law due to fraud in the inducement and violation of public policy. The intentional concealment of these material liabilities constitutes a separate and independent violation of Rule 10b-5.

6. As a direct and proximate result of the Defendants' intentionally fraudulent and unlawful conduct, Plaintiff asserts claims for: (1) Declaratory Judgment that the contract and subsequent amendments are void ab initio due to fraud in the execution and violation of

federal securities laws; (2) Securities Fraud under Section 10(b) and Rule 10b-5 of the Exchange Act, based on material misrepresentations and omissions in connection with the sale of securities; (3) Common Law Fraud under Texas law; and (4) Civil Conspiracy to commit securities fraud. Plaintiff seeks compensatory damages, punitive damages commensurate with the Defendants' willful and morally reprehensible conduct, disgorgement of ill-gotten gains, pre-judgment interest, attorneys' fees, and such other relief as this Court deems just and proper.

## II. JURISDICTION & VENUE

7. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, which grants exclusive jurisdiction to the district courts of the United States for violations arising under the Securities Exchange Act of 1934, including Rule 10b-5 promulgated thereunder. The transactions involved securities, as defined by SEC v. W.J. Howey Co., 328 U.S. 293 (1946) and the allegations involve claims of securities fraud, specifically false and misleading statements made in connection with the purchase or sale of securities, thereby invoking federal question jurisdiction, reinforcing jurisdiction under federal securities laws.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff BN Holdings Trust is a Nevada trust with its principal place of business in Texas, and Defendant Alan H. Ginsburg is a citizen of Florida. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district.

9. In the alternative, and to the extent necessary, the Court also retains supplemental jurisdiction over any related state law claims pursuant to 28 U.S.C. § 1367(a), as such claims form part of the same case or controversy under Article III of the United States Constitution.

10. This Court has retained jurisdiction over this matter pursuant to its prior orders and adjudications involving the same or related parties, facts, and/or issues, thereby invoking the doctrine of ancillary or continuing jurisdiction.

## III. PARTIES AND FACTS

11. Sagaliam Acquisition Corp. ("SAGA") is a Delaware Corporation.
12. SAGA is a Special Purpose Acquisition Corp. ("SPAC").
13. A SPAC—which can also be known as a "blank check company"—is a publicly listed company designed solely to acquire one or more privately held companies. The SPAC is a shell company when it goes public (i.e., it has no existing operations or assets other than cash and any investments).
14. As defined by the US Securities and Exchange Commission ("SEC"), a SPAC is a company with no operations that offers securities for cash and places substantially all the offering proceeds into a trust or escrow account for future use in the acquisition of one or more private operating companies. Following its initial public offering (IPO), the SPAC will seek to identify acquisition candidates and attempt to complete one or more business combination transactions, after which the company will continue the operations of the acquired company or companies as a public company.
15. According to the SEC's Investor.gov website, an investor in a SPAC is "relying on the management team that formed the SPAC often referred to as the sponsor(s)."

16. According to documents filed with the ("SEC") SAGA's Sponsor is Sagaliam Sponsor, LLC ("Sponsor").

17. According to documents filed with the SEC, the sole member of the Sponsor is GLD Sponsor Member, LLC, a Delaware limited liability company ("Sponsor Member").

18. According to documents filed with the SEC, the managing member of GLD Sponsor Member, LLC is Alan H. Ginsburg ("Ginsburg").

19. The Sponsor is the owner of "founder shares," as defined in Amendment 3 of the Form S-1 as filed with the SEC on November 19, 2021 (hereinafter "S1/A") (Exhibit 2).

20. Form S1/A states that, "'founder shares' are to [sic] shares of our Class B common stock, initially purchased by our sponsor in private placement prior to this offering, and the shares of our Class A common stock issuable upon the conversion thereof as provided herein;".

21. Form S1/A further states that, "[t]he initial holders of the Founder Shares have agreed not to transfer, assign or sell any of the Founder Shares until the earlier of (i) one year after the date of the consummation of the Company's initial business combination or (ii) the date on which the Company consummates a liquidation, merger, stock exchange or other similar transaction which results in all of its stockholders having the right to exchange their shares of Class A common stock for cash, securities or other property. Notwithstanding the foregoing, if the closing price of the Company's shares of Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing 150 days after the Company's initial business combination, the Founder Shares will no longer be subject to such transfer restrictions (see Note 8)."

22. Upon information and belief, from the date of the filing of the S1/A to the date of transfer and

sale of the Membership Units to the Plaintiff, none of the conditions precedent for the "transfer, assign[ment] or sale" of Founder Shares occurred.

23. The S1/A further states in a table showing beneficial ownership, that 2,650,000 shares of\ SAGA, "[r]epresents shares held directly by Sagaliam Sponsor LLC, our sponsor. The sole member of our sponsor is GLD Sponsor Member, LLC. The managing member of GLD Sponsor Member, LLC is Alan H. Ginsburg. As such, Mr. Ginsburg may be deemed to have beneficial ownership of the shares held directly by our sponsor."

24. On or about March 31, 2023, the Plaintiff entered into the Membership Interest Purchase Agreement ("1st Agreement") by and among the Sponsor and the Sponsor Member.

25. As late as May 31, 2023, Ginsburg is identified as the "sole member" of the Sponsor, and may be deemed to have beneficial ownership of the shares held directly by the Sponsor.

26. Pursuant to the 1st Agreement, the Sponsor Member agreed to transfer all rights, title, and interest in the Membership Interests to Plaintiff, free and clear of any encumbrances, unless otherwise stated.

27. Based on the contents of the 1st Agreement, Plaintiff, as the Buyer, is entitled to receive the ownership interests and associated rights in Sponsor Member.

28. Pursuant to the 1st Agreement, the Seller represented that the interests are valid and transferable, and that they have the authority to sell them, giving Plaintiff assurance that they are receiving clean title to the interests.

29. A Form 8-K was filed by SAGA on April 4, 2023, which states that "[o]n March 23, 2023, GLD Sponsor Member, LLC, a Delaware limited liability company (the "Seller"), entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") with BN Holdings Trust, a Nevada Trust ("BN Holdings Trust") and Sagaliam Sponsor, LLC (the

"Sponsor"), pursuant to which BN Holdings Trust agreed to purchase all of the issued and outstanding equity interests in the Sponsor from the Seller, which constitutes 100% of the membership interests in the Sponsor. The consummation of the transactions contemplated by the Purchase Agreement (the "Closing") is expected to take place at 10:00 am, New York time, on or before April 28, 2023. (Exhibit 3)

30. The Purchase Agreement referred to in the 8-K is the 1st Agreement. This 1st Agreement was signed by Daniel Gordon (hereinafter, "Gordon") as "Manager" of GLD Sponsor Member, LLC.

31. Gordon is referred to variously as "Manager," and "Managing Member," of the Sponsor Member.

32. On May 11, 2023, the Sponsor Member, filed a Form 3 ("Form 3"), showing the transfer or sale of the beneficial ownership of Class B Shares from Ginsburg to Gordon (Exhibit 4).

33. Also on May 11, 2023 a Schedule 13D, was filed by Gordon as Managing Member of GLD Sponsor Member, LLC, by Gordon as President of GLD Management, Inc. General Partner of GLD Partners, L.P. (Exhibit 5), and

34. The Form 3 shows a beneficial ownership of 1,363,000 shares, a reduction of 1,287,000 shares as the result of the "Share Distribution Agreement" dated April 25, 2023.

35. The Plaintiff was not informed of the existence of a Share Distribution Agreement that entitled Ginsberg to transfer beneficial ownership of shares to Gordon.

36. Ginsburg intentionally and in violation of the explicit terms of the S1/A failed to report multiple the changes of control, and thus the beneficial ownership of a portion of the Sponsor Member shares to Gordon.

37. According to the SEC, Form 3 must be filed within 10 calendar days of when any individual

becomes a corporate insider, meaning that once they have been appointed as an officer, director, or have become the beneficial owner of more than 10% of any class of the company's registered securities.

38. Also, according to the SEC, SAGA had four (4) days to report, but did not file for 12 days.

39. On May 11, 2023, GLD Sponsor Member, LLC, filed a Form 13D ("Form 13D"), which purports to show a change of beneficial ownership of 1,763,000 shares of common stock to Gordon, giving Gordon and GLD Partners, LP, 37.05% of the Common Stock outstanding as of December 22, 2022. (Exhibit 15 of Exhibit 5)

40. Exhibits 10.3 and Exhibit 10.4 of the Form 13D are an "Insider Letter," and "Waiver Letter," which purport to permit the transfer of beneficial ownership of shares between certain parties ("Permissible Transfers").

41. There is no 13D that has ever been filed with the SEC that shows a permissible transfer of beneficial ownership from Ginsburg to Gordon.

42. The failure to seek the written approval of SAGA for the transfer of beneficial ownership from Ginsburg to Gordon renders the transfer voidable or void *ab initio* and as such, all subsequent transactions or agreements entered into by Gordon as Managing Member or Manager of the Sponsor Member are void or voidable.

43. The failure to seek, and failure to report, the change of beneficial ownership from Ginsburg to Gordon is material omission and a willful and wanton violation of Rule 10b-5.

44. Pursuant to Rule 10b-5 it is unlawful to omit crucial information related to the purchase or sale of any security. Under Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011), omissions are actionable if they would be material to a reasonable investor.

45. Since the initial transfer of shares was unlawful, the subsequent sale of the Sponsor Member to the Plaintiff is voidable or *void ab initio*.

46. Email between Barry Kostiner ("Kostiner"), and Gordon, show that Gordon knows and has a relationship with Ginsburg and that Ginsburg is working in active concert with Gordon (Exhibit 6).

47. Gordon is subject to a Finald Judgment dated December 19, 2003 (hereinafter, the "Judgment") that permanently enjoin[s] him from future violations of Sections 10(b), 13(a), 13(b)(2), and 13(b)(5) and of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder. Gordon also consented to be barred from serving as an officer or director of a public company under Section 21(d)(2) of the Exchange Act.

48. The Judgment further states that, "Gordon, his agents, servants, employees, attorneys, assigns and all persons in active concert or participation with any of them, who receive actual notice of the [Judgment], by personal service or otherwise, are permanently restrained and enjoined from violating, directly or indirectly, Section 13(b)(5) of the Exchange Act by knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in Section 13(b)(2)…"

49. The Judgment further states that "this Court shall retain jurisdiction over this action for the purpose of enforcing this Final Judgement."(Exhibit 7).

50. Judge Sim Lake, United States District Judge to the Southern District of Texas, Houston Division was the presiding judge that signed the Judgment retaining ancillary jurisdiction.

51. From 2021 – 2023, Ginsburg acted in concert with Gordon, to hide both Gordon's involvement with the Sponsor, the Sponsor Member and his control over the CEO of SAGA, including submission of a questionnaire for NASDAQ containing all of Ginsburg's personal

information, social security number, address, and college history in what appears to be his personal handwriting (Exhibit 8).

52. Plaintiff alleges that Ginsburg, in concert with Gordon violated Section 13(b)(2), Section 12 and Section 15(d) of the Exchange Act in contempt of the Order.

53. Plaintiff alleges that Ginsburg in concert with Gordon violated Section 13(b)(5) and Section 21(d)(2) of the Exchange Act, in contempt of the Order.

54. A Plaintiff further alleges that Gordon's involvement constitutes a material omission and this allegation is further supported by an email to the CEO of SAGA from the law firm of Ellenoff Grossman & Schole LLP (hereinafter, "Ellenoff" and the "Ellenoff Letter"), related to the first S-1 registration statement (later amended) filed by SAGA which states:

> *We need to be clear: the assertion that there is no required disclosure regarding Dan Gordon is without basis in law. He is a promoter as defined by the securities laws, and as such is subject to disclosure along with officers and directors. There is no fair argument that his background is not material to an investor, and it must be disclosed fully and prominently in any public filings made by the company.*
>
> *Your proposed disclosure below is insufficient; at a minimum it omits reference to the sanction Dan received for filing false declarations under oath with the bankruptcy court. We know about this part of his background; what we don't have any confidence in knowing is whether we know everything we'd need to disclose about Dan's background, and we need that confidence. Specifically, we will not proceed with the representation in the absence of a full and prominent disclosure about Dan's background, and we are unable to draft any kind of disclosure in the absence of a full third-party background check of Dan.*
>
> *Given that we are in this predicament because of Dan's unwillingness to submit to a questionnaire before the original S-1 filing (or even afterwards), and the frankly disingenuous explanation for that unwillingness that we received when we inquired about it (that Dan is a "private person", as opposed to a convicted felon who was also found to have defrauded a bankruptcy court), our proposal is that we will choose a third-party background check vendor (most likely Kroll or someone similar) and the company will pay the background check fee. Once we receive and analyze that background check, we will draft a disclosure to be included in the amended S-1 (and will if possible provide you with copies of the background check itself, subject to you and Dan signing the appropriate release forms). If the company will not agree to (a) wait for the background check before*

*any additional steps re: the public offering, (b) pay for that background check, and (c) make the full and prominent disclosure of Dan's background that we will craft after having reviewed the background check, then EGS will be unable to move forward in its representation of Sagaliam Acquisition Corp.*

*We note that after we craft an appropriate disclosure, we have no guarantee that Maxim will still agree to underwrite the offering, or that Nasdaq will agree to host the company's listing. Furthermore, when we speak of "disclosure", it includes a response to Nasdaq's specific inquiry into Dan's background – again, we will not make any such response in the absence of a third-party background check, and if we do not respond to Nasdaq the company's listing likely will be denied on that basis.* (Exhibit 9)

55. Plaintiff did not receive a copy of the Ellenoff communication until February 6, 2024.

56. After the resignation of Ellenoff, all subsequent amendments to the S-1 including the final S-1/A remove any reference to Gordon, introducing Ginsburg.

57. Shortly after receipt of the Ellenoff Letter, there are no references to Gordon in any filings, including filings with the SEC, FINRA nor within the D&O insurance application.

58. But Gordon never relinquished control of the Sponsor and throughout the period from 2021 – 2023, exercised almost complete control over SAGA, the Sponsor and through various means and modalities exercised control over Kostiner.

59. Email received after July 2023, show that Gordon approved both the hiring of Mayer Brown and the termination of Maxim, along with substantially all other decisions of SAGA, the Sponsor and the Sponsor Member. (Exhibit 10).

60. It may be reasonably inferred that Gordon was always the control person, but that Ginsburg permitted his name to be used to induce parties into the IPO and all subsequent transactions including the acquisition of the Sponsor by the Plaintiff. In all documents used to raise funds, Ginsburg is listed as the control person, including the IPO, the PowerPoint Presentation, and all of the S-1 filed after Ellenhoff resigned.

61. Gordon represents himself as "a respected finance professional with a background in

international economics, public policy, and alternative investing" (Exhibit 11).

62. Gordon represents himself as the Managing Director of GLD Partners, LP. (Exhibit 12)

63. The "About Us" section of GLD Partners LP website, gldlp.com, makes no reference to Gordon (Exhibit 13).

64. Pursuant to Item 401 of Regulation S-K, confirmed by the Ellenoff Letter, certain legal proceedings involving Gordon should have been disclosed given his role as a stock promoter.

65. For example, on December 19, 2003, Gordon plead guilty in the United States District Court for the Southern District of New York (Gerard E. Lynch, Judge) to an elaborate scheme to defraud his employer, Merrill Lynch Capital Services, Inc., and Merrill Lynch & Co. (collectively "Merrill Lynch") of many millions of dollars.

66. Additionally, according to the New York Department of Taxation and Finance, a person identified as Daniel L. Gordon has an outstanding tax warrant in excess of $50,000,000 (Exhibit 14).

67. Furthermore, according to publicly available records, Gordon was found guilty of fraud on the United States Bankruptcy Court (Exhibit 15). The Bankruptcy Court found that "The Debtor [Gordon] made one decision after another to withhold disclosure of his financial dealings— including, most significantly, a $2 million transfer—and then made it worse by providing excuses for the failure to disclose that helped destroy his credibility and, quite frankly, insulted the intelligence of the Court (*ibid*, page 1)." The ruling in Gordon's Bankruptcy Case evidence a pattern of dealing wherein Gordon does not disclose information in a truthful manner in accordance with laws and regulations. The Ellenoff Law Firm told Gordon the Bankruptcy Sanctions and Finding of Fraud had to be disclosed (Exhibit 9). Instead of doing those disclosures, Gordon worked in concert with Ginsburg to hide Gordon's

involvement from the investing public and ultimately Petitioner.

68. The omission of Gordon is a material false statement or lie, and a clear omission of material facts necessary to make statements contained in the public filings not misleading. *See*, Macquarie Infrastructure Corp. v. Moab Partners, L. P., 601 U.S. ___ (2024).

69. Conversely, according to publicly available records Ginsburg is a sophisticated investor who is familiar with both federal and state securities laws

70. Plaintiff had no knowledge of Gordon's nefarious past prior to the execution of the 1st Agreement or the subsequent amendments.

71. Plaintiff alleges that the transfer from Ginsburg to Gordon was not properly disclosed in an 8-K or Form 13D in violation of Rule 10b-5. SEC v. Cavanagh, 155 F.3d 129 (2d Cir. 1998), affirms that such failures are material and actionable under Rule 10b-5.

72. In addition to the undisclosed change of control of the Sponsor from Ginsburg to Gordon, Ginsburg intentionally misrepresented the financial condition of the Sponsor and SAGA, by substantially and materially understating payables in the form of legal, accounting, audit and both federal and state tax liabilities.

73. Ginsburg and SAGA failed to disclose significant conflicts of interest, specifically, related party transactions by, between and among the directors, officers and various entities controlled by Gordon.

74. After the execution of the 1st Agreement, Plaintiff and Defendant executed a series of Amendments to the 1st Agreement.

75. Contained within the Fifth Amendment to the Membership Interest Purchase Agreement, is a Release in favor of the Sponsor and the Sponsor Member (Exhibit 16).

76. Included within the Release is specific and detailed language including, "Buyer

acknowledges and agrees that it has consulted with, and has been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Released Parties and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth herein do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity hereof. The provisions of this Section 8 shall survive the termination of this Fifth Amendment, the Agreement and payment in full of the Purchase Price."

77. Pursuant to Section 29(a) of the Securities Exchange Act of 1934, "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of [the Exchange Act]... shall be void," as shown in AES Corp. v. Dow Chemical Co., 325 F.3d 174 (3d Cir. 2003); *see also*, Cyan, Inc. v. Beaver County Employees Retirement Fund, 138 S. Ct. 1061 (2018), where similar releases were invalidated." This includes Section 10(b) and Rule 10b-5, which govern fraud in securities transactions. Under Texas law, fraud vitiates contractual waivers, as established in Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323 (Tex. 2011).

78. Despite exercising reasonable due diligence, Plaintiff, as an investor, could not have discovered the material misrepresentations and securities law violations committed by Ginsburg and Gordon through publicly available information or the documentation provided during the transaction. Plaintiff may justifiably rely upon the public filings of SAGA, the Sponsor and Ginsburg, including audited financial statements, made pursuant to Sarbanes-Oxley.

79. After closing of the transaction, Ginsburg and Gordon did not provide a copy of the Sponsor Member Operating Agreement, did not provide access to any books and records, and refused

access to accounting records, in violation of Texas Business Organizations Code § 101.502.

80. On February 6, 2024, Plaintiff delivered to Defendant, by email to aginsburg@ahg-group.com, the known email for Defendant Ginsburg, as the legal custodian of the Sponsor Member's books and records, a written demand for examination of governing records, financial books and records of account, contractual agreements, and all other documents evidencing the true ownership of Sagaliam Sponsor, LLC and the promotional information of Sagaliam Sponsor, LLC on behalf of Sagaliam Acquisition Corp. (Exhibit 17).

81. Ginsburg did not respond to the request for books and records. Plaintiff made the same demand on Gordon, and was denied access to any books and records, was not provided with copies of the LLC's Operating Agreement, any amendments thereto, accounting records and has been denied access to records held by third parties.

82. Plaintiff has been unable to confirm that the Sponsor maintained any books and records and may have intentionally withheld, altered, or destroyed records.

83. Plaintiff has been further informed that the Sponsor has certain agreements in place with third parties which result in the restraint on access to accounting and other records.

84. Defendant, in concert with Gordon, orchestrated the sale of the Sponsor Member as part of a deliberate scheme to fraudulently transfer millions of dollars of undisclosed liabilities to the Plaintiff, while simultaneously concealing material information required to be disclosed under federal securities laws.

## IV. <u>CLAIMS FOR RELIEF</u>

### A. CLAIM FOR DECLARATORY RELIEF

85. Plaintiff incorporates by reference the allegations set forth above.

86. The change of control of the Sponsor Member was unlawful and not disclosed pursuant

to both state and securities laws, including but not limited to the Securities Act of 1933.

87. The failure to disclose and the omission of material information is a violation of the Securities and Exchange Act of 1934, specifically the anti-fraud provisions of Rule 10b-5.

88. The 1st Agreement is voidable or void *ab initio* as against public policy and in violation of applicable Federal Securities laws, and in violation of Gordon's consent order with the SEC.

89. The "waiver and release" provisions inserted into the various amendments are void and unenforceable as a matter of law pursuant to Section 29(a) of the Securities Exchange Act of 1934, as they represent an impermissible attempt to shield Ginsburg and Gordon from liability for securities fraud and common law fraud through contractual provisions that contravene public policy and federal securities laws. Rescission is available under federal securities law for contracts induced by fraud, as confirmed in Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135 (2011).

90. Plaintiff respectfully requests that this Court render declaratory judgment in favor of the Plaintiff, declaring the 1st Agreement and all subsequent amendments including the Fifth Amendment, void.

### B. CAUSE OF ACTION FOR SECURITIES FRAUD PURSUANT TO RULE 10b-5

91. Plaintiff incorporates by reference the allegations set forth above.

92. Ginsburg knowingly and with wanton disregard for the applicable securities laws, or with extreme recklessness did permit his name and reputation to be used for the purpose of concealing the true ownership and control of SAGA, the Sponsor and Sponsor Member.

93. Ginsburg knowingly and with wanton disregard for applicable securities laws or with extreme recklessness, understated the true liabilities of SAGA, the Sponsor and the Sponsor Member.

94. Ginsburg profited from his misrepresentations and material omissions in an amount of at least $3,000,000.

95. The Plaintiff respectfully requests that this Court award the Plaintiff damages equivalent to the Plaintiff's actual financial losses.

96. At all relevant times, Defendant Ginsburg was a publicly recognized figure with a distinguished record of business leadership and philanthropic engagement. Plaintiff reasonably relied on Ginsburg's public stature, reputation for integrity, and formal designation as managing member of GLD Sponsor Member, LLC in determining that the transaction was legitimate and that the representations made in connection with the sale of securities were truthful and complete.

97. Ginsburg knowingly and with wanton disregard for the applicable securities laws, or with extreme recklessness did conceal the authority, role and actions of Gordon in violation of Section 20(a) of the Exchange Act ("Control Person Liability") in violation of Rule 10b-5.

98. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), establishes the economic loss and causal connection to misrepresentation," see also, SEC v. Tambone, 597 F.3d 436 (1st Cir. 2010), fraudulent actions by corporate insiders are actionable.

### C. CAUSE OF ACTION FOR COMMON LAW FRAUD

99. Plaintiff incorporates by reference the allegations set for above.

100. Under Texas law, actionable misrepresentations exist independent of the contract, as supported by Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc., 960 S.W.2d 41 (Tex. 1998). Additionally, In New York, even sophisticated parties can be misled by material

misrepresentations, per First Bank of the Americas v. Motor Car Funding, Inc., 257 A.D.2d 287 (N.Y. App. Div. 1999).

101. Ginsburg knowingly and with wanton disregard for the consequences of his actions, or with extreme recklessness concealed from the Plaintiff the material fact that a convicted felon was substantially involved in the day-to-day operations and management of SAGA, the Sponsor and the Sponsor Member, a fact that would have been material to any reasonable investor's decision to invest.

102. The actions, omissions and material misrepresentations, appear to show that the purpose of 1st Agreement was to transfer undisclosed liabilities to the Plaintiff.

103. The sole purpose of the release language contained in the Fifth Amendment to the 1st Agreement was to shield Ginsburg and Gordon from liability for willful violations of securities laws and for material misrepresentations and material omissions of fact.

104. The fraud was gross, willful, or morally reprehensible; and the fraud was part of a larger scheme and enterprise to defraud both the Plaintiff and the general public.

105. The Plaintiff respectfully requests that this Court award the Plaintiff actual damages, consequential damages, and exemplary damages up to three times actual damages as permitted under Texas Civil Practice and Remedies Code § 41.008 for fraud involving actual malice.

**D. CAUSE OF ACTION FOR TEXAS CIVIL CONSPIRACY**

106. Plaintiff incorporates by reference the allegations set forth above.

107. Under Texas law, as stated in Agar Corporation, Inc. v. Electro Circuits International, LLC, 580 S.W.3d 136, 141-142 (Tex. 2019) civil conspiracy can be asserted when multiple defendants combine to do something unlawful to cause damages.

108. There are five elements required to prove civil conspiracy: 1) a combination of two or more

persons; 2) the persons seek to accomplish an object or course of action; 3) the persons reach a meeting of the minds on the object or course of action; 4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and 5) damages occur as a proximate result. Tri v. J.T.T., 162 S.W.3d 552, 556 (Tex. 2005).

109. Ginsburg undertook a scheme to present himself as the control person of the Sponsor when he must have known that Gordon was the actual controlling person.

110. Ginsburg permitted his name to be used in public filings in order to induce investors, including the Plaintiff to believe that the Sponsor was a business entity exclusively controlled by the Defendant.

111. Intentionally omitting the identity of Gordon was an unlawful, overt act which resulted in the Plaintiff suffering millions of dollars of damages.

112. The failure to maintain books and records, withholding books and records and the failure to disclose significant conflicts of interest represent overt acts to conceal misconduct.

113. Ginsburg, Gordon and a number of other entities and individuals acted in concert with the objective of deceiving the Plaintiff and the general public.

**E. CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

114. Plaintiff incorporates by reference the allegations set forth above.

115. Defendant misrepresented material facts in the 1st Agreement, all subsequent amendments and in all public filings of the Sponsor and SAGA.

116. The Defendant knew or should have known that the statements were false.

117. The Defendant, acting in concert with Gordon and other parties intended to induce reliance upon Defendant's misrepresentations.

118. Plaintiff justifiably relied upon Defendant's statements.

119. Plaintiff suffered damages in excess of $3,000,000 due to the misrepresentations of the Defendant.

**F. CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

120. Plaintiff incorporates by reference the allegations set forth above.

121. Ginsburg and co-conspirators occupied positions of trust over BN Holdings' assets (as managers and advisors) and breached those duties through self-dealing, concealment, and mismanagement.

122. Plaintiff suffered damages in excess of $3,000,000 due to the misrepresentations of the Defendant.

**G. CAUSE OF ACTION FOR AIDING AN ABETTING BREACH OF FIDUCIARY DUTY**

123. Plaintiff incorporates by reference the allegations set forth above.

124. Defendant in joint action and mutual benefit, including overt acts such as providing false financial statements, coordinated a scheme to mislead investors and conceal both the Sponsor and SAGA's true financial state.

125. Defendant in joint action and mutual benefit committed overt acts for a period of 2 years in furtherance of the conspiracy in breach of Defendant's fiduciary duty.

126. As a result the Plaintiff suffered damages in excess of $3,000,000.

**H. CAUSE OF ACTION FOR UNJUST ENRICHMENT**

127. Plaintiff incorporates by reference the allegations set forth above.

128. Plaintiff conferred significant financial benefits on the Defendant.

129. Defendant had or should have had knowledge of the benefit.

130. Defendant in joint action and mutual benefit unjustly retained funds invested or transferred based on misleading information, resulting in a benefit that equity demands be returned.

## V. CONCLUSION

Plaintiff BN Holdings Trust has suffered substantial damages as a result of Defendants' sophisticated and systematic scheme to defraud perpetrated by Defendant Alan H. Ginsburg and his associates, characterized by numerous material misrepresentations, deliberate omissions of critical information, and unlawful transfers that violate both federal securities laws, including Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, as well as fundamental common law principles of fraud and fiduciary duty. The concealment of Daniel L. Gordon's control and criminal background, the failure to disclose changes in beneficial ownership, and the insertion of a release provision designed to preempt accountability all form part of a broader scheme to offload liabilities and deceive investors.

The conduct of the Defendants constitutes actionable fraud under Rule 10b-5 of the Securities Exchange Act of 1934 and under the common law of both Texas and New York. Plaintiff respectfully requests that this Court:

1. Declare the Membership Interest Purchase Agreement and all subsequent amendments, including the Fifth Amendment, **void**;
2. Award Plaintiff **compensatory damages** for its actual losses in an amount of not less than $3,000,000;
3. Award **punitive damages** for the Defendants' gross, willful, and morally reprehensible misconduct, in an amount of not less than $6,000,000;
4. Grant such other and further relief as the Court deems just and proper.

Courts recognize that Rule 10b-5 serves a deterrent purpose beyond compensation, as highlighted in Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972). Defendants must be held accountable not only to redress the harm done to Plaintiff but to deter similarly brazen

misconduct in future securities transactions. The Court should consider injunctive relief to prevent ongoing concealment or misrepresentation, particularly in regulatory filings.

Respectfully submitted,

/s/Patrick Ryan Morris

**MORRIS LEGAL CORP.**
By: Patrick Ryan Morris, Esq
305 Broadway
New York, New York 10007
Telephone: (917) 621-1110
Facsimile: (917) 970-8446
New York Bar Card Number 5575501
Southern District of Texas Number: 3833525