Exhibit 1, 1st Agreement

**GLD Comments – 03.21.2023**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of March 23, 2023, is made by and among Sagaliam Sponsor, LLC, a Delaware limited liability company (the "Company"), GLD Sponsor Member, LLC, a Delaware limited liability company ("Seller"), and BN Holdings Trust, a Nevada trust ("Buyer"). The Company, the Seller Parties and Buyer shall be referred to herein from time to time collectively as the "Parties". Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1.

WHEREAS, Seller is the sole member of the Company and owns beneficially and of record of all of the issued and outstanding equity interests in the Company (referred to herein as the "Interests"); and

WHEREAS, the Parties desire that, subject to the terms and conditions hereof, Buyer will purchase from Seller, and Seller will sell to Buyer, the Interests.

NOW, THEREFORE, in consideration of the premises and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

Definitions. As used in this Agreement, the following terms have the respective meanings set forth below.

"Action" means any action, claim, counterclaim, demand, charge, complaint, suit, or other dispute resolution or proceeding, whether judicial, administrative or arbitrative, whether civil or criminal, whether brought at equity or at law, and whether brought by a Governmental Entity or any other Person, in each case, by or before a Governmental Entity.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Agreement" has the meaning set forth in the introductory paragraph to this Agreement.

"Ancillary Documents" has the meaning set forth in Section 3.3.

"Assumed Obligations" shall mean the obligations of GLD Partners, LP to KPMG in connection with services rendered by KPMG in connection with the SPAC and prior business

KRM

combinations undertaken by the SPAC (in an amount not to exceed $450,000). The payment of the Assumed Obligations shall not be included in the Purchase Price.

"Business Day" means a day, other than a Saturday or Sunday, on which commercial banks in New York City are open for the general transaction of business.

"Buyer" has the meaning set forth in the introductory paragraph to this Agreement.

"Closing" has the meaning set forth in Section 2.1.

"Closing Date" has the meaning set forth in Section 2.1.

"Closing Indebtedness" means the sums outstanding to (i) CWR I, LLC in the amount of $622,500, (ii) GLD Principal Strategies, LLC in the amount of $85,096.70, and (iii) Bighorn I, LLC in the amount of $243,000.

"Company Indemnified Persons" has the meaning set forth in Section 6.3(a).

"Confidential Information" has the meaning set forth in Section 6.9.

"Contract" means, with respect to any Person, any contract, purchase order, lease, license, instrument, settlement agreement, or other agreement, commitment, or arrangement, whether written or oral, in each case (i) that is binding on such Person and/or (ii) to which such Person's assets are subject.

"D&O Tail Policy" has the meaning set forth in Section 6.3(b).

"Fraud" means knowing and intentional misrepresentation with respect to any representation or warranty made by the Company in Article 3 or any Seller Party in Article 4, in each case that also constitutes common law fraud.

"Fundamental Representations" means the representations and warranties of the Company contained in Section 3.1, Section 3.2, Section 3.3, and Section 3.16 and the representations and warranties of the Seller contained in Section 4.1, Section 4.3 and Section 4.5.

"GAAP" means United States generally accepted accounting principles.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation are its certificate of incorporation and bylaws, the "Governing Documents" of a limited partnership are its limited partnership agreement and certificate of limited partnership and the "Governing Documents" of a limited liability company are its operating agreement and certificate of formation.

"Governmental Entity" means any (i) federal, state, local, municipal, foreign or other government, (ii) governmental or quasi governmental entity of any nature (including any

KRM

governmental agency, branch, department, official, or entity and any court or other tribunal), whether foreign or domestic, or (iii) body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, whether foreign or domestic, including any arbitral tribunal.

"Indebtedness" means, as of any time with respect to any Person, without duplication, the outstanding principal amount of, accrued and unpaid interest on, and other payment obligations (including any prepayment fees, breakage costs, make-whole premiums or other similar fees or premiums payable as a result of the consummation of the transactions contemplated by this Agreement) arising under, any obligations of the Company consisting of: (i) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) indebtedness evidenced by any note, bond, debenture, letter of credit (but solely to the extent drawn and not paid), or other debt security, in each case, as of such date, (iii) obligations in respect of any financial hedging arrangements or similar agreements, (iv) capitalized lease obligations (but excluding any obligations relating to leased real property), (v) all obligations of another Person that are guaranteed or secured by any of the assets of the Company, but excluding any undrawn amounts under standby letters of credit or similar instruments, or claims, (vi) liabilities owed to the Seller or any of their affiliates with respect to services provided or other costs charged to the Company or its business, solely to the extent such liabilities are not discharged at or prior to the Closing pursuant to the agreements set forth in Section 2.3(a)(ii) or set forth on the Closing Statement, and (vii) liabilities for accrued and unpaid Taxes other than income Taxes as of the Closing Date.

"Indemnity Cap" means an amount in cash equal to $100,000.

"Latest Balance Sheet" has the meaning set forth in Section 3.4.

"Law" means any federal, state, local, municipal, foreign, international, multinational or other administrative order, code, constitution, law, ordinance, principle of common law, rule, regulation, statute or treaty.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge. For the avoidance of doubt, the term "Lien" shall not be deemed to include any grant of license, covenant not to sue or other rights with respect to Intellectual Property.

"Losses" of a Person means any and all liabilities, direct damages, awards, judgments, Taxes, costs and expenses (including, without limitation, reasonable attorneys' fees) actually suffered or incurred by such Person.

"Material Contracts" has the meaning set forth in Section 3.6(a)(vi).

"Parties" has the meaning set forth in the introductory paragraph to this Agreement.

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust, joint venture, association or other similar entity, whether or not a legal entity.

KRM

"Purchase Price" means $49,403.

"Releasing Party" has the meaning set forth in Section 6.8.

"Securities Act" has the meaning set forth in Section 5.6.

"Seller" has the meaning set forth in the introductory paragraph to this Agreement.

"Seller's Knowledge" means the knowledge of Daniel Gordon, assuming reasonable inquiry.

"SPAC" means Sagaliam Acquisition Corp., a Delaware corporation.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be a, or control any, managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" means (i) any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, windfall profits, customs, duties, real property, personal property, capital stock, social security (or similar), unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever and any interest, penalties or additions to Tax in respect of the foregoing (whether disputed or not) or (ii) a liability for amounts of the type described in clause (i) as a result Treasury Regulations §1.1502-6, as a result of being a transferee or successor, or as a result of a contract or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

## ARTICLE 2

## PURCHASE AND SALE

KRM

Section 2.1 Purchase and Sale of the Interests. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer will purchase from Seller, and Seller will sell to Buyer, the Interests in exchange for the Purchase Price. Excluded from the sale will be any cash held in bank accounts of the Company as of the Closing Date (which accounts shall be immediately closed thereafter).

Section 2.2 Closing of the Transactions Contemplated by this Agreement. The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at 10:00 a.m., New York time, on or before April 14, 2023 (the "Closing Date") at the offices of ______________________________, unless another time, date or place is agreed to in writing by Buyer and Seller. In the event the Closing occurs, the Closing shall be deemed effective, and the events scheduled for the Closing Date herein shall be deemed to occur simultaneously, as of 12:01 a.m. New York Time on the Closing Date.

Section 2.3 Deliveries at the Closing.

(a) Deliveries by Seller. At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(i) a duly executed Assignment of Membership Interests in the form attached hereto as Exhibit A;

(ii) a certificate of good standing or analogous status of the Company in its jurisdiction of organization and in each jurisdiction where it is qualified to do business as a foreign entity, dated not more than ten (10) days prior to the Closing Date;

(iii) copies of the Company's certificate of formation certified by the Secretary of State of Delaware;

(iv) a certificate of a secretary or other authorized officer of Seller certifying as to (i) the Company's Governing Documents, (ii) the Seller's Governing Documents, (iii) the resolutions duly adopted by all requisite Persons on Company's behalf authorizing and approving this Agreement, each Ancillary Document to which it is or is proposed to be a party, and the consummation of the transactions contemplated hereby and thereby, and (iv) the resolutions duly adopted by all requisite Persons on Seller's behalf authorizing and approving this Agreement, each Ancillary Document to which it is or is proposed to be a party, and the consummation of the transactions contemplated hereby and thereby; and

(v) written resignations of each of the officers of the Company.

(b) Deliveries by Buyer. At the Closing, Buyer shall deliver the following to Seller:

KRM

(i) Buyer shall pay the Purchase Price, in full without reduction or offset.

(ii) Buyer shall pay the holders of obligations constituting Closing Indebtedness, all such Closing Indebtedness that is required to be paid at Closing by virtue of the consummation of the transactions contemplated hereby;

(iii) Buyer shall deliver a certified copy of the resolutions of Buyer's board of directors (or other governing body) authorizing the execution and delivery of the Agreement and the consummation of the transactions contemplated hereby; and

(iv) Buyer shall execute and deliver the Indemnification & Hold Harmless Agreement in favor of each of the independent directors of the SPAC.

All payments made by Buyer pursuant to this Section 2.3(b) shall be made by wire transfer of immediately available funds to the accounts specified by Seller in writing prior to the date hereof.

(a) Deliveries by Company. At the Closing, Company shall deliver or cause to be delivered to Seller:

(i) Company shall deliver the Release, in the form attached hereto as Exhibit B, signed by each of the individuals and parties listed in Exhibit C hereto; and

(ii) Company shall deliver the Amended Letter Agreement, in the form attached hereto as Exhibit D, pursuant to which SPAC and EF Hutton, as underwriter to the SPAC, will consent to the transfer of certain Class A Units and Class B Shares from the Company to those individuals and entities listed on Exhibit E.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Buyer as follows:

Section 3.1 Organization and Qualification.

(a) The Company is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization. The Company has the requisite limited liability company power and authority to carry on its businesses as presently conducted.

Section 3.2 Capitalization of the Company.

(a) The Interests comprise all of the Company's authorized membership interests that are issued and outstanding, and the Interests have been duly authorized and validly issued and are fully paid and non-assessable. There are outstanding (i) no other equity securities of the Company, (ii) no securities of the Company convertible into or exchangeable for, at any time, equity securities of the Company, (iii) no options or other rights to acquire from the Company and no obligations of the Company to issue, any equity securities or securities convertible into or exchangeable for equity securities of the Company and (iv) no phantom equity interests or equity appreciation plans relating to the securities or other equity interests of the Company.

(b) The Company has no Subsidiaries.

Section 3.3 Authority. The Company has the requisite limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument and/or certificate contemplated by this Agreement to be executed in connection with the transactions contemplated hereby (the "Ancillary Documents") and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each Ancillary Document to which the Company is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of the Company. This Agreement and each Ancillary Document to which the Company is a party has been duly executed and delivered by the Company and constitute a valid, legal and binding agreement of the Company (assuming that this Agreement and the Ancillary Documents to which the Company is a party has been duly and validly authorized, executed and delivered by Buyer), enforceable against the Company in accordance with their terms, except (i) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the enforcement of creditors' rights generally and (ii) that the availability of equitable remedies, including, specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

Section 3.4 Consents and Approvals; No Violations. Assuming the truth and accuracy of the representations and warranties of Buyer set forth in Section 5.3, no notices to, filings with, or authorizations, consents or approvals of any Person or Governmental Entity are necessary for the execution, delivery or performance by the Company of this Agreement or the Ancillary Documents to which the Company is a party or the consummation by the Company of the transactions contemplated hereby, except for (i) those set forth on Schedule 3.5 and (ii) those that may be required solely by reason of Buyer's (as opposed to any other third party's) participation in the transactions contemplated hereby. Neither the execution, delivery or performance by the Company of this Agreement or the Ancillary Documents to which the Company is a party nor the consummation by the Company of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of the Company's Governing Documents, (b) result in a violation or breach of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any Material Contract to which the Company is party, (c) violate any Law, writ, injunction or decree of any

KRM

Governmental Entity having jurisdiction over the Company or (d) result in the creation of any Lien upon any of the assets of the Company.

Section 3.5 Material Contracts.

(a) Except for this Agreement, as of the date of this Agreement, other than those Contracts set forth on Schedule 3.6(a) (which shall be organized by subsection to conform to each clause below) the Company is not a party to or bound by any:

(i) Contract relating to Indebtedness or undrawn letters of credit;

(ii) lease or other Contract under which the Company is lessee of or holds or operates any tangible property, owned by any other Person, except for any lease or agreement under which the aggregate annual rental payments do not exceed $100,000;

(iii) lease or agreement under which the Company is lessor of or permits any third party to hold or operate any tangible property, owned or controlled by the Company, except for any lease or agreement under which the aggregate annual rental payments do not exceed $100,000;

(iv) Contract that relates to any disposition or acquisition of assets or properties by the Company or any material merger or business combination with respect to the Company; and

(v) other Contract that involves the expenditure, payment or receipt of more than $100,000 annually and is not terminable by the Company without penalty on notice of 60 days or less (collectively, the "Material Contracts").

(b) Each Material Contract is valid and binding on the Company and enforceable in accordance with its terms against the Company and, to the Seller's Knowledge, each other party thereto (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting generally the enforcement of creditors' rights and subject to general principles of equity). The Company is not (and, to the Seller's Knowledge, no other party to any such Material Contract is) in material breach of or default under any Material Contract, with or without the lapse of time or the giving of notice or both.

Section 3.6 Reserved.

Section 3.7 Litigation. As of the date of this Agreement, there is currently, and since December 31, 2021, there has been, no Action pending or, to Seller's Knowledge, threatened in writing or under investigation against, or otherwise materially affecting, the Company before any Governmental Entity. The Company is not subject to any outstanding order, writ, injunction, decree or settlement agreement as of the date hereof.

KLK

Section 3.8 Compliance with Applicable Law.

(a) The Company holds all material permits, licenses, approvals, certificates and other authorizations of and from all, and have made all declarations and filings with, Governmental Entities necessary for the lawful conduct of their respective businesses as presently conducted.

(b) The Company is, and has been at all times since December 31, 2021, in compliance in all material respects with all applicable Laws. The Company has not, since December 31, 2021, (A) received any written notice (or, to Seller's Knowledge, any oral communication to the Company) from any Governmental Entity regarding any actual or alleged violation by the Company or any director, manager, officer, employee, or independent contractor thereof acting in its capacity as such of any Law, or regarding any actual or potential investigation of the same, or (B) conducted its own material internal investigation, or made any voluntary disclosure to any Governmental Entity, with respect to any actual or suspected violation by the Company or any director, manager, officer, employee, or independent contractor thereof acting in its capacity as such of any Law.

Section 3.9 Reserved.

Section 3.10 Insurance. Schedule 3.10 contains a list of all policies of fire, liability, workers' compensation, property, casualty and other forms of insurance owned or held by the Company as of the date of this Agreement, including, with respect to each policy: (a) the type of policy; (b) the name of the insurer, policyholder, and each covered insured; (c) the name and address of the agent; and (d) the policy number, premiums, deductibles, limits, and period of coverage thereunder, as well as a list of all pending claims and the claims history for the Company since December 31, 2021. All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date will have been paid, and no notice of cancellation or termination has been received by the Company with respect to any such policy. The Company has not made any claim under any such policy during the two (2) year period prior to the date of this Agreement with respect to which an insurer has, in a written notice to the Company, questioned, denied or disputed or otherwise reserved its rights with respect to coverage and no insurer has threatened in writing to cancel any such policy.

Section 3.11 Tax Matters.

(a) All income and other material Tax Returns required to be filed by, or with respect to, the Company have been timely filed. All income and other material Taxes owed by, or with respect to, the Company (whether or not shown on any Tax Return) have been timely paid. The Company currently is not the beneficiary of any extension of time within which to file any Tax Return. The Company has (A) withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and (B) materially complied with all filings required with respect thereto, including without limitation IRS Forms W-2 and 1099.

KLM

(b) All Tax Returns filed by, or with respect to, the Company are true and correct in all material respects.

(c) The Company is not currently the subject of a Tax audit or examination.

(d) The Company has not consented to extend the time, or is the beneficiary of any extension of time, in which any Tax may be assessed or collected by any taxing authority.

(e) The Company has not received from any taxing authority any written notice of proposed adjustment, deficiency, underpayment of Taxes or any other such written notice which has not been satisfied by payment or been withdrawn.

(f) No claim has been made in writing by any taxing authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.

(g) There are no Liens for Taxes against any of the assets of the Company.

Section 3.12 Brokers. No broker, finder, financial advisor or investment banker, is entitled to any broker's, finder's, financial advisor's, investment banker's fee or commission or similar payment in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

Section 3.13 Real Property. The Company does not own any real property.

Section 3.14 EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES. NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO THE COMPANY OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), EXCEPT AS OTHERWISE EXPRESSLY SET FORTH BY THE COMPANY IN THIS ARTICLE 3 OR ARTICLE 4, IN ANY ANCILLARY DOCUMENT AND ANY OTHER CERTIFICATE FOR OTHER INSTRUMENT DELIVERED BY THE COMPANY PURSUANT TO THIS AGREEMENT, THE COMPANY EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE INTERESTS OR BUSINESSES OR ASSETS OF THE COMPANY, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO SUCH ASSETS, ANY PART THEREOF, THE WORKMANSHIP THEREOF, AND THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, AND BUYER IS RELYING UPON ITS OWN EXAMINATION AND INVESTIGATION THEREOF AS WELL AS THE REPRESENTATIONS AND WARRANTIES OF THE COMPANY SET FORTH IN THIS

KRM

AGREEMENT, ANY ANCILLARY DOCUMENT AND ANY OTHER CERTIFICATE OR OTHER INSTRUMENT DELIVERED BY THE COMPANY PURSUANT HERETO.

**ARTICLE 4**

**REPRESENTATIONS AND WARRANTIES RELATING TO SELLER**

The Seller represents and warrants to Buyer as follows:

Section 4.1 Authority. Seller has the requisite corporate power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate and/or limited liability company action, as applicable, on the part of Seller. This Agreement and the Ancillary Documents to which Seller is a party have been duly executed and delivered by Seller and constitutes a valid, legal and binding agreement of Seller, enforceable against Seller in accordance with their terms, except (i) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the enforcement of creditors' rights generally and (ii) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any Action thereof may be brought.

Section 4.2 Consents and Approvals; No Violations. Except as set forth on Schedule 4.2, assuming the truth and accuracy of the representations and warranties of Buyer set forth in Section 5.3, no notices to, filings with, or authorizations, consents or approvals of any Governmental Entity are necessary for the execution, delivery or performance by the Seller Parties of this Agreement or the Ancillary Documents to which any Seller Party is a party or the consummation by a Seller Party of the transactions contemplated hereby. Neither the execution, delivery and performance by a Seller Party of this Agreement or the Ancillary Documents to which such Seller Party is a party nor the consummation by a Seller Party of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of such Seller Party's Governing Documents, (b) except as set forth on Schedule 4.2, result in a violation or breach of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any material agreement to which such Seller Party is a party or (c) violate any Law, writ, injunction or decree of any Governmental Entity having jurisdiction over such Seller Party.

Section 4.3 Title to the Interests. Seller owns of record and beneficially all of the Interests, and Seller has good and marketable title to the Interests, free and clear of all Liens.

Section 4.4 Litigation. There is no Action or investigation pending or, to Seller's Knowledge, threatened in writing against before any Governmental Entity against Seller which would otherwise prevent or materially delay the Closing or otherwise prevent Seller from complying with the terms and provisions of this Agreement.

KRM

Section 4.5 Brokers. No broker, finder, financial advisor or investment banker is entitled to any broker's, finder's, financial advisor's, investment banker's fee or commission or similar payment in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

Section 4.6 EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES. NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), EXCEPT AS OTHERWISE EXPRESSLY SET FORTH BY THE SELLER IN THIS ARTICLE 4, IN ANY ANCILLARY DOCUMENT AND ANY OTHER CERTIFICATE OR OTHER INSTRUMENT DELIVERED BY ANY SELLER PARTY PURSUANT TO THIS AGREEMENT, THE SELLER PARTIES EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE INTERESTS OR BUSINESSES OR ASSETS OF THE COMPANY, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO SUCH ASSETS, ANY PART THEREOF, THE WORKMANSHIP THEREOF, AND THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, AND BUYER IS RELYING UPON ITS OWN EXAMINATION AND INVESTIGATION THEREOF AS WELL AS THE REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES SET FORTH IN THIS AGREEMENT, ANY ANCILLARY DOCUMENT AND ANY OTHER CERTIFICATE OR OTHER INSTRUMENT DELIVERED BY THE SELLER PURSUANT HERETO.

Section 4.7 The Seller is not insolvent, nor will the Seller be made insolvent by the transfer contemplated by this Agreement, nor does the Seller anticipate any pending insolvency.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Seller Parties as follows:

Section 5.1 Organization. Buyer is a Nevada trust, duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation and has all requisite power and authority to carry on its businesses as now being conducted, except where the failure to have such power or authority would not prevent or materially delay the consummation of the transactions contemplated hereby.

Section 5.2 Authority. Buyer has all necessary power and authority to execute and deliver this Agreement and the Ancillary Documents to which Buyer is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Documents to which Buyer is a party and the consummation of the transactions

KRM

contemplated hereby have been authorized by all necessary action on the part of Buyer and no other proceeding on the part of Buyer is necessary to authorize this Agreement and the Ancillary Documents to which Buyer is a party or to consummate the transactions contemplated hereby and thereby. This Agreement and the Ancillary Documents to which Buyer is a party have been duly and validly executed and delivered by Buyer and constitute a valid, legal and binding agreement of Buyer (assuming this Agreement has been and the Ancillary Documents to which Buyer is a party will be duly authorized, executed and delivered by the Seller Parties), enforceable against Buyer in accordance with their terms, except (i) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the enforcement of creditors' rights generally and (ii) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any Action thereof may be brought.

Section 5.3 Consents and Approvals; No Violations. Assuming the truth and accuracy of the Company's representations and warranties contained in Section 3.5 and the Seller's representations and warranties contained in Section 4.2, no material notices to, filings with, or authorizations, consents or approvals of any Governmental Entity are necessary for the execution, delivery or performance of this Agreement or the Ancillary Documents to which Buyer is a party or the consummation by Buyer of the transactions contemplated hereby, except for those set forth on Schedule 5.3. Neither the execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which Buyer is a party nor the consummation by Buyer of the transactions contemplated hereby will (a) conflict with or result in any breach of any provision of Buyer's Governing Documents, (b) except as set forth on Schedule 5.3, result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination or cancellation) under any contract agreement or other instrument or obligation to which Buyer is a party or by which any of them or any of their respective properties or assets may be bound, or (c) violate any Law, writ, injunction or decree of any Governmental Entity applicable to Buyer or any of Buyer's Subsidiaries or any of their respective properties or assets, except in the case of clauses (b) and (c) above, for violations which would not prevent or materially delay the consummation of the transactions contemplated hereby.

Section 5.4 Brokers. No broker, finder, financial advisor or investment banker is entitled to any broker's, finder's, financial advisor's or investment banker's fee or commission or similar payment in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer or any of its Affiliates.

Section 5.5 Sufficiency of Funds. Buyer has, on the date hereof, the financial capability and all sufficient cash on hand necessary to consummate the transactions contemplated by this Agreement on the terms and subject to the conditions set forth herein and to pay all associated fees, costs and expenses incurred by it in connection therewith, and will have all such capability and sufficient cash on hand as of the Closing.

Section 5.6 Investment Representation. Buyer is acquiring the Interests for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities laws. Buyer is an "accredited investor" as defined in Regulation D

KRM

promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). Buyer acknowledges that it is informed as to the risks of the transactions contemplated hereby and of ownership of the Interests. Buyer acknowledges that the Interests have not been registered under the Securities Act or any state or foreign securities laws and that the Interests may not be sold, transferred, offered for sale, assigned, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the Securities Act and the Interests are registered under any applicable state or foreign securities laws or sold pursuant to an exemption from registration under the Securities Act and any applicable state or foreign securities laws.

Section 5.7 Solvency. Upon consummation of the transaction contemplated hereby, and assuming in each case that each of the representations and warranties of the Seller made in this Agreement and the Ancillary Documents are true and correct in all material respects as of the Closing Date, as of immediately following the Closing, Buyer and the Company, taken as a whole, will not (a) be insolvent or left with unreasonably small capital, (b) have incurred debts beyond their ability to pay such debts as they mature, or (c) have liabilities in excess of the reasonable market value of their assets.

Section 5.8 Investigation; No Other Representations.

(a) Buyer has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, condition, operations and prospects of the Company.

(b) In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties of the Company and the Seller expressly contained in Article 3 and Article 4, respectively, and Buyer acknowledges that, other than as set forth in this Agreement, the other Ancillary Documents and in the certificates or other instruments delivered pursuant hereto, none of the Seller, the Company or any of their respective directors, officers, employees, Affiliates, stockholders, members, managers, agents or representatives makes or has made any representation or warranty, either express or implied, (x) as to the accuracy or completeness of any of the information provided or made available to Buyer or any of its respective agents, representatives, lenders or Affiliates prior to the execution of this Agreement or (y) with respect to any projections, forecasts, estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows (or any component thereof) or future financial condition (or any component thereof) of the Company heretofore or hereafter delivered to or made available to Buyer or any of its respective agents, representatives, lenders or Affiliates. Without limiting the generality of the foregoing, and except for the representations and warranties made in this Agreement, the other Ancillary Documents and in the certificates or other instruments delivered pursuant hereto, none of the Seller, the Company or any of their respective directors, officers, employees, Affiliates, stockholders, members, managers, agents or representatives has made, and shall not be deemed to have made, any representations or warranties in the materials (other than as set forth in this Agreement) relating to the

KRM

business, assets or liabilities of the Company made available to Buyer, including due diligence materials, memorandum or similar materials, or in any presentation of the business of the Company by management of the Company or others in connection with the transactions contemplated hereby, and no statement contained in any such materials or made in any such presentation shall be deemed a representation or warranty hereunder or otherwise or deemed to be relied upon by the Buyer in executing, delivering and performing this Agreement and the transactions contemplated hereby; provided, however, that in no manner shall the acknowledgments of Buyer in this Section 5.8 constitute a waiver of any Fraud.

## ARTICLE 6
## COVENANTS

Section 6.1 Taxes.

(a) The Seller shall prepare and file (or cause to be prepared and filed) (i) all Tax Returns with the appropriate federal, state, local and foreign taxing authorities relating to the Company for tax periods ending on or before the Closing Date and (ii) a "final" Tax Return for the tax period for the fiscal year ending as of the Closing Date.

(b) The Buyer shall (i) obtain a new federal tax identification number for the Company and (ii) be responsible for filing all Tax Returns for periods after the Closing Date.

Section 6.2 Public Announcements. At Closing, the Company shall issue a press release in a form acceptable to Buyer. No other press release or public announcement related to this Agreement or the transactions contemplated herein, shall be issued or made by any party hereto without the joint approval of Buyer, on one hand, and the Company and Seller, on the other, unless required by law (in the reasonable opinion of counsel) in which case Buyer, the Company or Seller, as applicable, shall have the right to review such press release, announcement or communication prior to its issuance, distribution or publication; provided, however, that the foregoing shall not restrict or prohibit Buyer, the Company or Seller from making any announcement to its employees, equity holders, customers and other business relations to the extent Buyer, the Company or Seller, as applicable, reasonably determines in good faith that such announcement is necessary or advisable; provided further that each of Buyer, the Company, Seller and their respective Affiliates may provide general information about the subject matter of this Agreement in connection with their respective fund raising, marketing, informational or reporting activities.

Section 6.3 Indemnification; Directors' and Officers' Insurance.

(a) Buyer agrees that all rights to indemnification or exculpation now existing in favor of the directors, officers, employees and agents of the Company (the "Company Indemnified Persons"), as provided in the Company's Governing Documents with respect to any matters occurring prior to the Closing Date, shall survive the transactions contemplated by this Agreement and shall continue in full force and effect for a period of

KRM

six (6) years after the Closing Date and that the Company on its own behalf, will perform and discharge its obligations to provide such indemnity and exculpation. The Company shall comply with, and provide the company Indemnified Persons with all rights and protections provided in, the Company's Governing Documents, notwithstanding any subsequent modification, amendment or termination of any such Governing Documents, and Buyer shall cause the Company to comply with the provisions of this sentence. The Buyer shall guaranty and be financially responsible for the Company's obligations in this Section 6.3(a) in the event that the Company fails to or is unable to comply with same.

(b) At the Closing, Buyer shall cause the Company to, and the Company shall, , purchase a six (6)-year "tail" policy providing directors' and officers' liability insurance coverage for the benefit of those Persons who are covered by the Company's directors' and officers' liability insurance policies as of the date hereof or at the Closing (the "D&O Tail Policy"). Premiums for the D&O Tail Policy shall be paid by the Company or the Buyer and Seller shall have no liability for same.

(c) The Buyer shall cause the SPAC to purchase and maintain directors' and officers' liability insurance policies providing the directors and officers of the SPAC with directors' and officers' liability insurance coverage.

(d) The directors, officers, employees and agents of the Company and SPAC entitled to the indemnification, liability limitation, exculpation and insurance set forth in this Section 6.3 are intended to be third party beneficiaries of this Section 6.3. This Section 6.3 shall survive the consummation of the transactions contemplated by this Agreement and shall be binding on all successors and assigns of Buyer and the Company.

Section 6.4 Assumed Obligations & Contingent Liabilities. The Buyer shall assume sole and complete liability for the Assumed Obligations as of the Closing Date. The Buyer shall cause the Assumed Obligations to be paid in full as of the closing date of a business combination for the SPAC. The Buyer further recognizes and assumes liability for those obligations and liabilities as set forth on Exhibit F hereto (the "Contingent Liabilities"). The Buyer's liability for the Contingent Liabilities shall be secondary to that of the SPAC. In the event that the SPAC fails to pay the Contingent Liabilities, Buyer hereby agrees to assume sole responsibility for the prompt and complete satisfaction of same.

Section 6.5 Documents and Information. After the Closing Date, Seller, Buyer and the Company shall, until the seventh (7th) anniversary of the Closing Date, retain all books, records and other documents pertaining to the business of the Company that is in such party's possession for all Pre Closing Tax Periods in existence on the Closing Date and make the same available for inspection and copying by Seller (at Seller's expense) or Buyer (at Buyer's expense), as applicable, during normal business hours, upon reasonable request and upon reasonable notice. No such books, records or documents shall be destroyed after the seventh (7th) anniversary of the Closing Date by Buyer, the Seller Parties or the Company, without first advising Seller or Buyer, as applicable, in writing and giving Seller or Buyer, as applicable, a reasonable opportunity to obtain possession thereof.

KRM

## ARTICLE 7
## SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS; INDEMNIFICATION

Section 7.1 Survival of Representations, Warranties and Covenants. The representations and warranties of the Company contained in Article 3 and the Seller Parties in Article 4 and the Buyer contained in Article 5 shall survive the Closing until the first (1st) anniversary of the Closing Date (the "Release Date"); provided, however, that the representations and warranties of the Company in Section 3.2(a) and the Seller in Section 4.3 shall survive the Closing indefinitely. The agreements and covenants set forth in this Article 7 and Article 8 shall survive in accordance with the terms thereof.

Section 7.2 General Indemnification.

(a) Subject to the other provisions of this Article 7, from and after the Closing, the Seller shall indemnify, defend and hold Buyer and/or its respective officers, directors, employees, Affiliates and/or agents (each a "Buyer Indemnitee") harmless from: (i) any Losses resulting from any breach of any representation or warranty made by the Company or the Seller contained in Article 3 or Article 4, respectively; and (ii) any Losses resulting from any breach by Seller of any of the covenants contained herein which are to be performed by Seller after the Closing.

(b) Subject to the other provisions of this Article 7, Buyer agrees to, and shall, after the Closing, cause the Company to, indemnify, defend and hold Seller and its Affiliates, officers, directors, employees, members, managers and agents (each a "Seller Indemnitee") harmless from any Losses resulting from: (i) any breach of any representation or warranty made by Buyer contained in Article 5; (ii) any breach by Buyer of any of its covenants or agreements contained herein; (iii) any breach by the Company of any of its covenants or agreements contained herein which are to be performed by the Company after the Closing Date; and (iv) any Losses arising out of any act or omission occurring or failing to occur on the part of Buyer, the Company or any of their respective Affiliates, successors, assignees or transferees under the Assumed Obligations on or after the Closing.

(c) The obligations to indemnify and hold harmless pursuant to this Section 7.2 shall survive the consummation of the transactions contemplated hereby for the applicable period set forth in Section 7.1, except for claims for indemnification asserted specifically and in writing prior to the end of such applicable period (which claims shall survive until final resolution thereof).

Section 7.3 Third Party Claims.

(a) If an Action by a Person who is not a Party or an Affiliate thereof (a "Third Party Claim") is made against any Person entitled to indemnification pursuant to Section 7.2 (an "Indemnified Party"), and if such Person intends to seek indemnity with respect thereto under this Article 7, such Indemnified Party shall promptly give a notice of claim to the Party obligated to indemnify such Indemnified Party (such notified Party, the

KRM

"Responsible Party"); provided that the failure to give such notice of claim shall not relieve the Responsible Party of its obligations hereunder, except to the extent that the Responsible Party is actually prejudiced thereby. The Responsible Party shall have thirty (30) days after receipt of such notice to assume the conduct and control, at the expense of the Responsible Party, of the settlement or defense thereof, and the Indemnified Party shall cooperate with the Responsible Party in connection therewith; provided that the Responsible Party shall permit the Indemnified Party to participate in such settlement or defense through counsel chosen by such Indemnified Party (the fees and expenses of such counsel shall be borne by such Indemnified Party). Such assumption of the conduct and control of the settlement or defense shall not be deemed to be an admission or assumption of liability by the Responsible Party. So long as the Responsible Party is reasonably contesting any such claim in good faith, the Indemnified Party shall not pay or settle any such claim without the consent of the Responsible Party. If the Responsible Party elects not to conduct the defense and settlement of a Third Party Claim, then the Indemnified Party shall have the right to pay or settle such Third Party Claim; provided that in such event it shall waive any right to indemnity by the Responsible Party for all Losses related to such claim unless the Responsible Party shall have consented to such payment or settlement (which consent shall not be unreasonably delayed, withheld or conditioned). If the Responsible Party shall have assumed the conduct or control of the defense or settlement of a Third Party Claim, no Indemnified Party shall admit any liability with respect to, or settle, compromise or discharge, such Third Party Claim without the prior written consent of the Responsible Party, which shall not be unreasonably delayed, withheld or conditioned. If the Responsible Party does not notify the Indemnified Party within thirty (30) days after the receipt of the Indemnified Party's Notice of Claim hereunder that it elects to undertake the defense thereof, the Indemnified Party shall have the right to contest, settle or compromise the claim but shall not thereby waive any right to indemnity therefor pursuant to this Agreement.

(b) All of the Parties shall reasonably cooperate in the defense or prosecution of any Third Party Claim in respect of which indemnity may be sought hereunder and each of Buyer and the Company (or a duly authorized representative of such Party) shall (and shall cause the Company to) furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested in connection therewith.

Section 7.4 Limitations on Indemnification Obligations. The rights of the Buyer Indemnitees and the Seller Indemnitees to indemnification pursuant to the provisions of Section 7.2 are subject to the following limitations:

(a) the Buyer Indemnitees shall not be entitled to recover for any particular Loss (including any series of related Losses) pursuant to Section 7.2(a)(i) (other than Losses arising from (x) Fraud or (y) breach of any of the Fundamental Representations) unless such Loss (including any series of related Losses) equals or exceeds $50,000;

(b) the Seller shall not be obligated to indemnify the Buyer Indemnitees for any Losses arising under Section 7.2(a)(i) (other than Losses arising from (x) Fraud or

KRM

(y) breach of any of the Fundamental Representations) until the Buyer Indemnitees shall have suffered such Losses in an aggregate amount equal to $100,000 (the "Basket Amount"), after which point the Seller shall be obligated to indemnify each Buyer Indemnitee solely from and against the aggregate amount of such Losses in excess of the Basket Amount;

(c) the maximum liability of the Seller (inclusive of any amounts paid out from the Indemnity Escrow Amount) with respect to Losses indemnifiable pursuant to Section 7.2(a)(i) shall be the Indemnity Cap, other than in the case of (i) Fraud or (ii) any breach of any of the Fundamental Representations, in which case such maximum liability of the Seller shall be the Purchase Price actually received by the Seller;

(d) the maximum liability of the Seller with respect to Losses indemnifiable pursuant to Section 7.2(a) shall be the Purchase Price; and

(e) the amount of any and all Losses shall be determined net of any amounts actually recovered by the Buyer Indemnitees under insurance policies or from other collateral sources (such as contractual indemnities of any Person which are contained outside of this Agreement) with respect to such Losses.

Section 7.5 Exclusive Remedy. Except in the case of Fraud, from and after the Closing the rights of the parties to indemnification pursuant to the provisions of this Article 7 shall be the sole and exclusive remedy for the parties hereto with respect to any matter in any way arising from or relating to (i) this Agreement or its subject matter or (ii) any other matter relating to the Seller or the Company prior to the Closing, the operation of their respective businesses prior to the Closing, or any other transaction or state of facts involving Seller or the Company prior to the Closing (including any common law or statutory rights or remedies for environmental, health, or safety matters), in each case regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, and that the Buyer Indemnitees shall have no other remedy or recourse with respect to any of the foregoing other than pursuant to, and subject to the terms and conditions of, Section 7.2(a). Buyer acknowledges and agrees that, other than the specific instances referenced in the prior sentence, the Buyer Indemnitees may not avoid such limitation on liability by (x) seeking damages for breach of contract, tort or pursuant to any other theory of liability, all of which are hereby waived or (y) asserting or threatening any claim against any Person that is not a party hereto (or a successor to a party hereto) for breaches of the representations, warranties and covenants contained in this Agreement. The parties hereto agree that the provisions in this Agreement relating to indemnification, and the limits imposed on Buyer's and the Buyer Indemnitees' remedies with respect to this Agreement and the transactions contemplated hereby (including Section 7.1 and Section 7.2) were specifically bargained for between sophisticated parties and were specifically taken into account in the determination of the amounts to be paid to the Seller hereunder.

## ARTICLE 8
## MISCELLANEOUS

KRM

Section 8.1 Entire Agreement; Assignment. This Agreement (a) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof (including, without limitation, that certain letter of intent, dated March __, 2023, by and among BN Holdings Trust and GLD Sponsor Member, LLC) and (b) shall not be assigned by any Party (whether by operation of Law or otherwise), other than for collateral purposes, without the prior written consent of Buyer and Seller. See Section 8.6 note.

Section 8.2 Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by facsimile (followed by overnight courier), e-mail (followed by overnight courier), or by registered or certified mail (postage prepaid, return receipt requested) to the other Parties as follows:

To Buyer or to the Company:

with a copy (which shall not constitute notice to Buyer) to:

To Seller:

GLD Sponsor Member, LLC
c/o GLD Partners, LP
10940 Wilshire Boulevard, Suite 705
Los Angeles, CA 90024

with a copy (which shall not constitute notice to a Seller Party) to:

GLD Partners, LP
1325 Avenue of the Americas
19th Floor
New York, NY 10019
Attn: Legal Department

or to such other address as the Party to whom notice is given may have previously furnished to the others in writing in the manner set forth above.

JLRM

Section 8.3 Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Law of any jurisdiction other than the State of New York.

Section 8.4 Fees and Expenses. Except as otherwise set forth in this Agreement, all fees and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such fees or expenses.

Section 8.5 Construction; Interpretation. The term "this Agreement" means this Membership Interest Purchase Agreement together with the schedules and exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof. The headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement. No Party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions hereof, and all provisions of this Agreement shall be construed according to their fair meaning and not strictly for or against any Party. Unless otherwise indicated to the contrary herein by the context or use thereof: (a) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole, including the schedules and exhibits, and not to any particular section, subsection, paragraph, subparagraph or clause contained in this Agreement; (b) masculine gender shall also include the feminine and neutral genders, and vice versa; (c) words importing the singular shall also include the plural, and vice versa; (d) "$" and "dollar" shall refer to U.S. dollars, and (e) the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation".

Section 8.6 Exhibits and Schedules. All exhibits and schedules, or documents expressly incorporated into this Agreement, are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement. Any item disclosed in any schedule referenced by a particular section in this Agreement shall be deemed to have been disclosed with respect to every other section in this Agreement if the relevance of such disclosure to such other section is reasonably apparent. The specification of any dollar amount in the representations or warranties contained in this Agreement or the inclusion of any specific item in any schedule is not intended to imply that such amounts, or higher or lower amounts or the items so included or other items, are or are not material, and no party shall use the fact of the setting of such amounts or the inclusion of any such item in any dispute or controversy as to whether any obligation, items or matter not described herein or included in a schedule is or is not material for purposes of this Agreement.

Section 8.7 Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each Party and its successors and permitted assigns, and except as provided in Section 6.3 and Article 7, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

KLM

Section 8.8 Severability. If any term or other provision of this Agreement is invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

Section 8.9 Counterparts; Facsimile Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

Section 8.10 No Recourse.

This Agreement may only be enforced against, and any claims or cause of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

Section 8.11 Amendment. This Agreement may be amended or modified only by a written agreement executed and delivered by duly authorized officers of Buyer, Seller and the Company. This Agreement may not be modified or amended except as provided in the immediately preceding sentence and any purported amendment by any Party or Parties effected in a manner which does not comply with this Section 8.11 shall be void.

Section 8.12 Intentionally deleted

Section 8.13 Jurisdiction and Venue. Each of the Parties (i) submits to the exclusive jurisdiction of any state or federal court sitting in New York, NY, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Each Party agrees that service of summons and complaint or any other process that might be served in any action or proceeding may be made on such Party by sending or delivering a copy of the process to the Party to be served at the address of the Party and in the manner provided for the giving of notices in Section 8.2. Nothing in this Section 8.13, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law. Each Party agrees that a final, non-appealable judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law.

KRM

Section 8.14 Remedies. Except as otherwise expressly provided herein, any and all remedies provided herein will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties hereto do not perform their respective obligations under the provisions of this Agreement (including failing take such actions as are required of them hereunder to consummate the transactions contemplated by this Agreement) in accordance with their specific terms or otherwise breach such provisions.

*[Signature page follows]*

KRM

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

**BUYER**

*BN Holdings Trust*

________________________
By: KR Miller
Its: Trustee

**SELLER**

*GLD Sponsor Member, LLC*

________________________
By:
Its:

**EXHIBIT A**

**Sagaliam Sponsor LLC**
**Existing Capitalization Table**

| | |
|---|---|
| **Private Placement of Class A Units** | **400,000** |
| Distribution of Class A Units | |
| GLD Sponsor Member, LLC (or designee) | 400,000 |
| **Allocation of Class B Shares** | **2,675,000** |
| Distribution of Class B Shares | |
| GLD Sponsor Member, LLC (or designee) | 1,363,000 |
| Barry Kostiner | 50,000 |
| Thomas W. Neukranz | 40,000 |
| Jane Liu | 10,000 |
| George Caruolo | 25,000 |
| Gabriel Del Virginia | 25,000 |
| Glauco Lolli-Ghetti | 25,000 |
| Daniel Janoff | 44,445 |
| Deventer, LLC | 62,222 |
| Zalman Ungar | 71,111 |
| Shimon Lefkowitz | 8,333 |
| Samuel Guttman | 5,556 |
| GSM CR Trust | 83,333 |
| James O'Donnell | 66,667 |
| Clay Brock | 33,333 |
| Tom O'Connell | 33,333 |
| Cary Sucoff | 20,000 |

KRM

**EXHIBIT D**

[Date]

| | |
|---|---|
| Mayer Brown | $1,450,[illegible] |
| KPMG | $ [illegible] |
| Marcum LLP | $ 50,000 |
| Calabrese Consulting | $ 75,000 |
| MZ | $ 4,200 |
| Morrow Sodali | $ 35,000 |
| California Franchise Tax | $ 800 |

[To be confirmed]

KRM

**EXHIBIT F**

| | |
|---|---|
| Mayer Brown | $1,410,000 |
| KPMG | $ 425,000 |
| Marcum LLP | $ 50,000 |
| Calabrese Consulting | $ 75,000 |
| M2 | $ 4,200 |
| Morrow Sodali | $ 35,000 |
| California Franchise Tax | $ 800 |

[To be confirmed]

KRM

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

**BUYER**

*BN Holdings Trust*

_________________________
By:
Its:

**SELLER**

*GLD Sponsor Member, LLC*

_________________________
By: Daniel Gordon
Its: Manager