Exhibit 15, Decision after Trial Bankruptcy Fraud

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>DANIEL GORDON,<br>Debtor. | Chapter 7 Case<br>No. 09-16230 (REG) |
| ANGELA G. TESE-MILNER, as Trustee of the Estate of Daniel Gordon,<br><br>Plaintiff,<br>v.<br><br>DANIEL GORDON,<br>Defendant. | Adversary Proceeding<br>No. 10-03767 (REG) |

# DECISION AFTER TRIAL

APPEARANCES:

Fox Rothschild LLP
*Counsel for Plaintiff Angela Tese-Milner,*
*Trustee of the Estate of Daniel Gordon*
100 Park Avenue
Suite 1500
New York, New York 10017
By: Yann Geron, Esq. (argued)

Akerman Senterfitt LLP
*Counsel for Defendant Daniel Gordon*
335 Madison Avenue
Suite 2600
New York, New York 10017
By: Donald N. David, Esq. (argued)

Case 4:25-cv-02018 Document 1-15 Filed 05/05/25 in TXSD Page 3 of 41

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 7 case of Debtor-Defendant Daniel Gordon, Plaintiff-Chapter 7 Trustee Angela Tese-Milner seeks a judgment denying the debtor a discharge of his debts. Relying on Bankruptcy Code sections 727(a)(2) and 727(a)(4)(A), respectively, the Trustee alleges that Gordon concealed property of the estate, transferred property of the estate with the intent to hinder, delay, or defraud creditors or a trustee, and knowingly and fraudulently made false oaths in connection with his bankruptcy case.

This matter was more challenging than many dischargeability adversary proceedings by reason of the way the Debtor managed his affairs. He used no less than six corporations and two family trusts as means to fund his business affairs and his lifestyle, and conversely transferred personal assets of his to those entities, with little or no financial accounting for the transfers, when those entities needed cash. That by itself would not necessarily have been wrongful, even when money departed from the Debtor's estate, if it had been properly disclosed—which might then have provided the Trustee with the ability to unravel the dealings, and the ability to recover from those other entities the receivables that the outflows from the Debtor's estate created or would create. But the Debtor made one decision after another to withhold disclosure of his financial dealings—including, most significantly, a $2 million transfer—and then made it worse by providing excuses for the failure to disclose that helped destroy his credibility and, quite frankly, insulted the intelligence of the Court.

After trial, the Court determines that when the Debtor transferred his property out to those other entities (even including the $2 million), he did not do so with the intent of keeping that property away from creditors or the Trustee. But in his failures to be up front with respect to his financial dealings, the Debtor displayed a cavalier disregard for his disclosure obligations in a

bankruptcy case. He made one material nondisclosure after another, and so many false oaths that they are difficult to count. Some were by sloppiness alone, and cannot be held to be sufficiently intentional to be actionable. But the other failures of disclosure cannot likewise be held to be innocent mistakes. Accordingly, the Court must and does deny Gordon a discharge, and judgment will be entered accordingly.

The Court's Findings of Fact and Conclusions of Law in connection with this determination follow.

## Findings of Fact[1]

### *1. Background*

Gordon filed a chapter 7 petition with this Court on October 18, 2009, following a string of legal problems that began in 2003. That year, Gordon pled guilty to three felonies: (i) wire fraud in connection with a scheme to defraud his employer, Merrill Lynch, of $43 million; (ii) money laundering; and (iii) conspiracy to defraud the United States. Gordon was convicted on these counts, and served 22 months in prison from late 2005 to 2007.

The IRS subsequently sued Gordon in the United States Tax Court for taxes relating to the $43 million Gordon was convicted of fraudulently obtaining. Though Gordon asserted that he had already repaid his gains in connection with the criminal proceeding, his attempts to settle with the IRS failed in September 2009, and the tax case was set for trial. Faced with the possibility of a multi-million dollar judgment he could not pay, Gordon filed his chapter 7 case during the following month.

[1] To minimize the length of this decision, citations are limited to the most significant matters, and detail that is unnecessary to this decision has been left out.

Case 4:25-cv-02067 Document 1-15 Filed 05/05/25 in TXSD Page 5 of 41

*2. Issues in this Adversary Proceeding*

After her appointment, the Trustee brought this adversary proceeding. Her complaint, as narrowed after its filing, asserts three grounds for relief.

*A. Failures to Disclose Assets?*

In her first count, premised on section 727(a)(2) of the Bankruptcy Code,[2] the trustee charges *failures to disclose* (with the intent to hinder, delay, or defraud creditors or a trustee) three receivables Gordon allegedly owned at the time of his filing, valued at more than $3 million by the Trustee.[3] The bulk of these—more than $2 million—were owed by two companies Gordon owned indirectly: AllStar Capital, Inc. ("**AllStar Capital**") and Wurk Times Square LLC ("**Wurk TS**").[4] The remaining $1 million receivable was allegedly owed to Gordon by one David Stack ("**Stack**") in exchange for a 50% interest in Citadel Construction Corporation ("**Citadel**"), which Gordon allegedly owned indirectly.

*B. Transferring Property?*

In her second count, also premised on section 727(a)(2), the Trustee charges Gordon with *transferring property* with the intent to hinder, delay, or defraud creditors or a trustee—based on cash transfers, totaling between $4.65 and $5.65 million, initiated by Gordon in the year

---

2 It provides that the bankruptcy court "shall grant the debtor a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition . . . .

3 The Trustee also alleged that Gordon did not disclose $157,978 in tax refunds that the IRS owed him, but abandoned this claim before trial. *See* Trial Tr. 4:23–5:14, Mar. 12, 2013, ECF No. 57 ("**Trial Tr. Vol. 1**").

4 Joint Pretrial Order ¶¶ 23, 32, Mar. 13, 2013, ECF No. 56 ("**Pretrial Order**"). The Pretrial Order includes undisputed facts as agreed upon by the parties.

preceding his bankruptcy petition. The transfers—all made to entities Gordon allegedly owned directly or indirectly—were of $2 million to AllStar Capital (the same $2 million giving rise to the allegedly concealed receivable discussed above);[5] $1.5 to $2.5 million to Wurk Environments LLC ("**Wurk Environments**");[6] $650,000 to Citadel; and $500,000 to Wurk TS (a subsidiary of Wurk Environments). The recipients of these transfers, the Trustee alleged, were all entities Gordon owned directly or indirectly.

*C. False Oaths?*

In her third count, premised on section 727(a)(4) of the Code,[7] the Trustee charges Gordon with materially false statements under oath, with numerous allegations challenging the veracity of Gordon's filings with the Court. The Trustee alleges that Gordon never properly disclosed three of the transfers noted above; materially underreported his income; omitted transfers to creditors and to his IRA; failed to list eight business affiliates; omitted four debts for which he was a guarantor; and omitted a lawsuit pending against him in New York state court.

*3. Gordon's Schedules and Statements*

A few weeks after the October 2009 filing of his bankruptcy petition, in November 2009, Gordon filed his bankruptcy schedules ("**Initial Schedules**") and Statement of Financial Affairs ("**Initial Financial Affairs Statement**"). About three months thereafter, in February 2010, Gordon filed an amended Statement of Financial Affairs ("**Amended Financial Affairs**

---

5 This was in essence pleading in the alternative. The Trustee alleged, in substance, that if the $2 million was paid out of Gordon's future estate without consideration, it was a fraudulent conveyance; if it was paid in exchange for a receivable, the receivable was fraudulently concealed.

6 Gordon's Amended Financial Affairs Statement (defined below) reported a $1.5 million transfer to Wurk Environments; Gordon's Second Amended Financial Affairs Statement (also defined below) revalued the same transfer at $2.5 million.

7 It provides another exception to the general duty to grant a discharge, where:

> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> (A) made a false oath or account . . . .

**Statement**"). About three months after the Trustee's September 2010 commencement of her dischargeability action, in December 2010, Gordon filed amended bankruptcy schedules ("**Amended Schedules**") and a second amended Statement of Financial Affairs ("**Second Amended Financial Affairs Statement**").

*4. AllStar Capital*

A major feature of each of the Trustee's concealing property and false oaths counts was the Debtor's failure to disclose the $2 million transfer to (and corresponding receivable from) AllStar Capital. Though she also put forward an alternative claim that the $2 million was advanced without an intent that it be paid back (and thus was a fraudulent conveyance), she principally contended that Gordon lent the $2 million to AllStar Capital in the year preceding his bankruptcy petition, and then omitted the $2 million receivable in his filings with this Court.

Gordon took the position at trial that the $2 million was indeed a loan. He then contended that the $2 million loan was fully repaid before his petition date, and that he did not have to disclose the loan in any event because it was in the ordinary course of his business.[8]

For reasons set forth below, the Court must reject each of Gordon's contentions.

AllStar Capital, of which Gordon was the sole officer and director, was incorporated in Nevada in January 2008. It was in the business of making loans at very high interest rates to individuals, including (and perhaps especially) professional athletes.[9] Gordon controlled AllStar Capital's books and records, to the extent there were records. But neither AllStar Capital, nor Gordon on behalf of AllStar Capital, maintained a general ledger or cash receipts journal.[10]

---

8 Trial Tr. Vol. 1 40:17–22, 32:3–7.

9 Trial Tr. Vol. 1 127:10–13, 79:10–18, 53:4–6. Nevada is the only state that allows interest rates at levels that high.

10 Trial Tr. Vol. 1 27:1–18. Nor did AllStar Capital maintain physical office space or own any physical property.

Case 4:25-cv-02018 Document 1-15 Filed 05/05/25 in TXSD Page 8 of 41

Though Gordon was AllStar Capital's only officer and director, the stock of AllStar Capital was owned by a trust and family limited partnership: the Carolina E. Gordon Trust ("**Carolina Trust**"), of which Gordon was the trustee, and Gordon Family I, LP ("**Gordon Family I**"), of which Gordon was a limited partner. For obvious reasons, Gordon considered AllStar Capital an insider company.[11] And for equally obvious reasons, the Court finds that AllStar Capital was an insider; Gordon was its sole officer and director, and had the ability to control its affairs.

In October 2008, Gordon made a $2 million transfer to AllStar Capital (the "**AllStar Capital Loan**"), assertedly as a loan.[12] Gordon received no promissory note with respect to this loan, and while he generally denied that AllStar Capital lacked documentation for the AllStar Capital Loan, he could not recall any such documentation aside from a tax return and documents provided to Signature Bank representing AllStar Capital's financial condition.[13] And even then, Gordon was not sure whether the documents referred to the loan directly or stated AllStar Capital's interest expense and outstanding loans in the aggregate.[14]

Shortly after receiving the funds, "perhaps the next day," according to Gordon, AllStar Capital lent the proceeds to a company called Urban Muse. That loan was outstanding as of the filing date of Gordon's chapter 7 petition, but was repaid a little over a week later.[15]

---

[11] Trial Tr. Vol. 1 30:22–31:8.

[12] Pretrial Order at ¶ 23; Trial Tr. Vol. 1 28:10 (Gordon: "Yeah, I made a loan to AllStar Capital, yes, of $2 million.") (transcription error corrected).

[13] Trial Tr. 17:6–9, Mar. 13, 2013, ECF No. 57 ("**Trial Tr. Vol. 2**"); Trial Tr. Vol. 1 36:14–21; Stip. Exh. 11 (Response of AllStar Capital to Trustee's Request for Admissions, dated May 5, 2011) ¶¶ 1–2.

[14] Trial Tr. Vol. 2 17:22–25.

[15] Trial Tr. Vol. 1 78:23–79:9, 154:16–23.

Gordon did not list the AllStar Capital Loan as an asset on his Initial Schedules or on his Amended Schedules, or as a transfer in response to Questions 3 or 10 on any version of his Statement of Financial Affairs.

Gordon cited three reasons for his failure to report the AllStar Capital Loan on his Schedules or Statement of Financial Affairs. The Court necessarily must reject each explanation, as unsupported by (and inconsistent with) the factual record, common sense, or both.

*A. Asserted Repayment of Loan*

First, Gordon asserted that AllStar Capital repaid the loan in full before his filing date by making a $75,000 payment to him, and numerous payments to third parties on his behalf, that functioned as repayments of the $2 million principal plus interest.[16] At trial, and for the first time, Gordon introduced a schedule of these payments prepared by his attorney (the "**Repayment Schedule**").[17] The payments itemized in that schedule totaled just over $2 million; then Gordon claimed that there were other, undocumented, payments that made the total repaid equal to approximately $2.35 million, which was said to be the $2 million lent plus interest accrued at an unspecified rate.[18]

The Court does not find that explanation at all credible, and rejects it as a fact. There were no contemporaneous manifestations at all of these supposed repayments, nor was there any other evidence of the type that one would normally expect—no receipts, no book entries, no memos, no corroborating witnesses. The Repayment Schedule, the Court finds, was a document prepared long after the fact for purposes of litigation. The explanation that this hodge podge of

---

16 Trial Tr. Vol. 1 46:12–19, 40:23–41:9; *see* Stip. Exh. 14 (Email from Donald David, Esq. to Andrez Carberry, Esq., dated March 3, 2011, and attachment entitled "[Corrected] AllStar Capital, Inc. Loan Repayments to Daniel Gordon").

17 *See* Stip. Exh. 14.

18 Trial Tr. Vol. 1 52:10–53:8.

asserted repayments was in fact repayments of an extraordinarily large (albeit wholly undocumented) loan can only be regarded as a fabrication, and the Court so finds.

*B. Asserted Transfer in Ordinary Course*

Next, Gordon claimed that the $2 million transfer originating the AllStar Capital Loan was in the ordinary course of business, and thus was exempt from the Statement of Financial Affairs' reporting requirements. As part of its loan business, he said, AllStar Capital periodically needed to borrow funds to lend to its clients, which it sometimes obtained from outside sources, and sometimes obtained from Gordon.[19] But Gordon was unable to recall any other specific occasions on which he lent money to AllStar Capital, aside from when he initially capitalized the company in April 2008. And even those contributions came from Gordon Family I, not from Gordon personally.[20] And at no time did Gordon earlier make any loan to AllStar of any amount remotely close to $2 million. In fact, he did not recall ever transferring more than $500,000 to AllStar Capital.[21] The $2 million transferred is an extraordinarily large sum of money, and while conceptually, it might not always be impossible to find a transfer of such a large sum to be in the ordinary course of business, an ordinary course conclusion would require a meaningful factual predicate. Here there was none.

---

19 Trial Tr. Vol. 1 79:10–14; Trial Tr. Vol. 2 26:18–21 (Debtor: "AllStar Capital [sic] was making a series of loans at the time and from time-to-time it needed to borrow money to loan out again and if there was a need and I could have met that need, I most certainly would have.").

20 Stip. Exh. 10 at ¶ 68 (Affidavit of Daniel Gordon); Trial Tr. Vol. 2 24:2–4.

21 Trial Tr. Vol. 2 26:5–10. Gordon estimated that any transfers he did make were "in the neighborhood of 75 to $150,000." Trial Tr. Vol. 2 27:7–8. Gordon alleged that these ongoing, smaller transfers, along with his readiness to lend more should AllStar Capital require it, demonstrated that the $2 million loan was in the ordinary course of his business and thus exempt from the Statement of Financial Affairs' reporting requirement. Trial Tr. Vol. 2 26:15–23. The Court does not agree. The transfers are of dramatically different magnitudes.

*C. Asserted No Need to Disclose*

Finally, Gordon argued that he did not include the AllStar Capital Loan on any version of his Statements of Financial Affairs because he thought Question 10's reference to "other transfers" referred to transfers of personal property other than cash.[22] The Court rejects this explanation as absurd. Gordon's later two versions of the Statement of Financial Affairs included cash transfers other than the AllStar Capital Loan. Aside from the plain meaning of the required disclosure, no reasonable person could regard transfers of personal property to be covered while transfers of cash would not be. Transfers of cash would be as prejudicial to creditors as a transfer of personal property would be.

* * *

Gordon does not dispute that the transfers were knowing, and the Court would not have believed him if he had done so; once again, a transfer of $2 million can hardly be overlooked, and the Court cannot find that the failure of disclosure was inadvertent. By reason of those factual findings, in the context of the legal principles discussed below, the Court finds that Gordon (1) concealed property and (2) made a false oath by omitting the AllStar Capital Loan and resulting receivable from his Schedules and Statements of Financial Affairs.[23]

*5. Citadel Construction*

The Trustee alleges in her transferring property and false oaths counts that Gordon paid Citadel a total of $650,000 in the year preceding his bankruptcy petition, in an attempt to hinder, delay or defraud creditors or a trustee, and then failed to list the transfers on his filings with this Court. While admitting the transfers, Gordon denies that they were made with the intent to

---

[22] Trial Tr. Vol. 1 32:8–14.

[23] These findings do not, however, support a finding that Gordon intended to hinder, delay or defraud creditors of the Trustee, and the Court does not so find.

hinder, delay or defraud creditors, a contention with which the Court ultimately agrees. Gordon further denies that the Citadel transfers needed to be disclosed, contending that they were capital contributions in the ordinary course of his business, and that Citadel was never his personal creditor.[24] In this latter respect, however, the Court disagrees.

The Court finds that the transfers needed to be disclosed; that they were not; that the failures to disclose were not inadvertent; and that the explanations for failing to disclose the transfer were unpersuasive.

Citadel, a corporation, was a construction firm in which Gordon, indirectly, and McCann Construction LLC ("**McCann Construction**"), directly, owned an interest of between 50% and 100% during the relevant period.[25] Gordon Family I, of which Gordon was a limited partner, purportedly held 100% of McCann Construction.[26] While Gordon conceded that he was a "director, officer, shareholder, member, and/or person in control of Citadel" within six years of the petition date, Gordon maintained that he never held a direct interest in Citadel.[27]

In January 2009, Gordon caused to be transferred $650,000 from his Wachovia credit line to Citadel by means of two transactions, occurring four days apart.[28] Gordon listed neither of these payments to Citadel (together, the "**Citadel Transfers**") on any version of his Statements of Financial Affairs, even though the transactions occurred within one year of his filing date.

Gordon contends that there was no need for disclosure of the Citadel Transfers on the Statement of Financial Affairs. Gordon does so for two reasons. First, he contends that Citadel

---

[24] Trial Tr. Vol. 1 92:12–94:12; Debtor's Post-Trial Br. at 18.

[25] Trial Tr. Vol. 1 141:5–21.

[26] Pretrial Order at ¶ 48. The parties disputed whether Gordon or Gordon Family I, with Gordon as a limited partner, was the true owner of McCann Construction. Because the Court's decision here does not turn on the resolution of that issue, the Court makes no findings as to the true owner of McCann.

[27] Pretrial Order at ¶ 83; Trial Tr. Vol. 1 141:`9–21.

[28] Pretrial Order at ¶ 50, 53.

was not a creditor of Gordon's, and thus not within the ambit of Question 3 on the Statement of Financial Affairs.[29] Second, he contends that the Citadel Transfers took place in the ordinary course of his business, and were thus outside the reporting requirement of Question 10 of the Statement of Financial Affairs.[30]

If either of these contentions were correct, Gordon would be right in concluding that they did not need to be disclosed, but the Court cannot agree that either contention was.

Gordon claimed that each of the payments to Citadel was made to satisfy the obligations of Wurk TS, another Gordon affiliate, that had engaged Citadel to perform construction services at a leased office property. As discussed below, Wurk TS was in the business of leasing fractional office space to commercial tenants, and Citadel was constructing premises suitable for that purpose. Gordon characterized the Citadel Transfers as infusions of equity capital to Wurk Environments (Wurk TS's parent), even though the funds were remitted *directly* to Citadel.[31] It was simply more convenient, he said, to pay Citadel directly rather than give the funds to Wurk Environments and then to Wurk TS and then to Citadel.[32] So while the payments did satisfy a debt, Gordon claimed it was Wurk TS's debt and not his own. Thus, Gordon's position was that Citadel was never *his* creditor, and the payments did not need to be disclosed in response to Question 3 of the Statement of Financial Affairs.

Gordon also argued that the transfers were in the ordinary course of his personal business and exempt from Question 10's disclosure requirement. Gordon attempted to show at trial that

---

29 Question 3 on the SOFA provides, in relevant part: "list all payments . . . to any creditor."

30 Question 10 of the SOFA provides, in relevant part: "List all property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred . . . within two years immediately preceding the commencement of this case."

31 Trial Tr. Vol. 1 93:1–3.

32 Trial Tr. Vol. 1 133:3–13.

he regularly contributed capital to fund the build-out of Wurk's fractional office business,[33] and that he was supporting numerous startup businesses at the time of the Citadel Transfers.[34] But the Trustee rebutted these arguments by pointing to Gordon's Initial Schedules and Amended Schedules, in each of which Gordon listed Citadel as a creditor with a claim of "Unknown" size, directly contradicting his later position that Citadel was never his personal creditor.

* * *

Gordon does not dispute that the Citadel Transfers were knowing, and the Court would not have believed him if he had done so; once again, transfers totaling $650,000 are too hard to innocently overlook, and the Court cannot find that the failure of disclosure was inadvertent. The Court finds that Gordon made false oaths, warranting the denial of his discharge, by failing to list the Citadel Transfers in response to Question 10 of the Statement of Financial Affairs. It also finds that Gordon concealed the assets (debt or capital) resulting from the Citadel Transfers. But the Court cannot agree with the Trustee that Gordon made the Citadel Transfers to hinder, delay or defraud creditors or a Trustee.

*6. McCann Construction*

The Trustee alleged in her concealing assets count that Gordon was the true owner of a promissory note issued by David Stack (the "**Stack Note**") in connection with Stack's purchase of 50% of Citadel from McCann Construction—and that Gordon failed to list the Stack Note as an asset on his Schedules. Gordon replied that *McCann Construction*, not he, owned the Stack Note, and thus that he did not have a duty to disclose it as an asset.

---

[33] Trial Tr. Vol. 1 138:8–17.

[34] Debtor's Post-Trial Br. at 2 ("For the past ten years, Gordon has been an entrepreneur investing in startup business ventures . . . .").

As noted above, McCann Construction owned between 50% and 100% of Citadel Construction at all relevant times. McCann Construction's stake in Citadel declined to 50% when it sold half of its position to David Stack in the transaction detailed below. Gordon Family I was allegedly the sole member of McCann Construction, and Gordon was a limited partner of Gordon Family I.

Around February 2009, Citadel hired David Stack as its President. In connection with that hire, McCann Construction agreed to sell 50% of its ownership interest in Citadel to Stack for $1 million, which Stack purchased using a promissory note that he was to repay in the first quarter of 2010.[35] The Trustee and Gordon have disputed the ownership of the Stack Note, with the Trustee arguing that Gordon owns that receivable, and Gordon countering that McCann Construction owns it.

In October 2009, when Gordon realized that Stack was unlikely to meet the obligations of the promissory note, he retained the firm of Todtman, Nachamie, Spizz & Johns.[36] The retainer agreement sent by Barton Nachamie (the "**Nachamie Letter**"), a partner at that firm, referred to Gordon as the client and was addressed to Gordon, not to McCann Construction.[37] Gordon replied by email correcting Nachamie, stating that Gordon was not a direct owner of McCann Construction.[38] Despite Gordon's clarification regarding the ownership of McCann Construction (and thus the ownership of the Stack Note), AllStar Capital paid a $10,000 retainer fee to the

---

35 Trial Tr. Vol. 1 90:18–91:1; 141:5–18 (referencing Stip. Ex. 29 ("You advised me that in February of this year you sold your 50 percent interest to Mr. Stack for $1 million")).

36 *See* Stip. Exh. 29.

37 Stip. Exh. 29.

38 Stip. Exh. 29 (Debtor, replying to Nachamie's draft retainer agreement: "The only modification I would suggest is that I am not the sole member of McCann Construction, LLC. The sole member is Gordon Family I, Limited Partnership – of which I am the General Partner."). Actually, according to the Joint Pretrial Order, Gordon was a *limited* partner, not a general partner, of the Gordon Family I, Limited Partnership. *See* Pretrial Order at ¶ 22.

Case 4:25-cv-02018 Document 1-15 Filed 05/05/25 in TXSD Page 16 of 41

Nachamie's firm,[39] which Gordon's counsel characterized as a repayment of Gordon's $2 million AllStar Capital Loan on the Repayment Schedule.[40]

Around the time of Gordon's petition, McCann Construction initiated a foreclosure process against David Stack, settled, and recovered all of the shares it had previously given him.[41]

The Trustee alleged that Gordon was the true owner of the Stack Note at the time of his petition, and thus had an obligation to disclose it. She pointed to the language in the Nachamie Letter, which referred to Gordon as the client (and thus, presumably, showed that he was the owner of the receivable), and focused on the language in the retainer agreement—*i.e.*, the Nachamie Letter—stating: "you [Gordon] advised me [Nachamie] that . . . you sold *your* 50 percent interest to Mr. Stack . . . ."[42] And the Trustee argued that AllStar Capital's payment of the retainer fee on Gordon's personal behalf buttressed the argument that Gordon, and not McCann Construction, was the owner of the Stack Note, and that Gordon thus should have disclosed it.

But Gordon responded that the Nachamie Letter was erroneous, and that he swiftly requested a correction. And Nachamie's testimony reinforced that position, describing McCann Construction as the actual client in the dispute with Stack.[43]

* * *

The Court finds Gordon's explanations in this respect satisfactory, and finds that McCann Construction, and not Gordon personally, was the owner of the Stack Note. In light of the

---

39 Trial Tr. Vol. 1 48:11–14.

40 *See* the discussion of the Repayment Schedule on pp. 8–9 above; Stip. Exh. 14.

41 Trial Tr. Vol. 1 141:25–142:6.

42 Stip. Exh. 29 (emphasis added).

43 Nachamie Aff. at ¶ 8.

structure of the underlying transaction, McCann Construction would be the natural owner; Gordon corrected Nachamie; and Nachamie would not have the same knowledge of the underlying state of affairs that Gordon did. Thus the Court finds no fault on Gordon's part by reason of the failure to disclose the Stack Note, and rejects the Trustee's contention that Gordon made a false oath with respect to the Stack Note, or concealed it as an asset.

*7. Wurk Environments, Wurk TS and Wurk Management*

The Trustee further asserted, in her transferring property count, that Gordon made two transfers, totaling $650,000, to Wurk TS and its affiliates in an effort to frustrate creditors or the trustee, and that Gordon made a false oath by failing to disclose one such transfer. In the concealing property count, the Trustee contended that Gordon omitted from his Initial Schedules a $15,000 receivable due to him from Wurk TS.

As with the Citadel Transfers, Gordon argued that the transfers to Wurk were legitimate capital contributions made in the ordinary course of his business, and that the recipients were not his creditors. He further argued that his failure to list the receivable was inadvertent and corrected in a subsequent submission to this Court.

Wurk TS was a limited liability company formed in 2008 that operated as a fractional office space provider.[44] To implement its business plan, Wurk TS leased empty office space, constructed ready-to-use premises, and then subleased portions of those premises to customers.[45] Wurk TS's sole owner was Wurk Environments, another limited liability company.[46] Wurk Environments, in turn, was owned by Gordon (95%) and Gordon Family I (5%), of which

---

44 Pretrial Order ¶ 27.

45 Trial Tr. Vol. 1 131:18–132:3.

46 Trial Tr. Vol. 1 73:12–16.

Gordon was a limited partner.[47] Wurk Management, another subsidiary of Wurk Environments, held an operating contract with Wurk TS.[48] Gordon conceded that he was a manager and person in control of Wurk TS at all times relevant to this case.[49] After the petition date, Wurk TS ceased operations, in part because it was unable to pay debts relating to its office space construction.[50]

*A. Wurk TS Transfer*

In February 2009, Gordon transferred $500,000 to Wurk TS (the "**Wurk TS Transfer**") from his Wachovia credit line.[51] He did not disclose this transfer on any version of his Statements of Financial Affairs.

The Trustee argues that the Wurk TS Transfer was made with an intent to hinder, delay or defraud creditors or a trustee. Gordon responds, in an argument similar to that he made when defending the Citadel Transfers, that the Wurk TS Transfer was a capital contribution, which he said Wurk TS used to fund its ongoing construction contract with Citadel.[52] Gordon testified that he was Wurk's only material source of capital.[53] Nevertheless, in spite of his efforts, Wurk TS later became subject to a mechanic's lien by one of Citadel's subcontractors, and its landlord terminated Wurk's lease and filed for foreclosure on its furniture and other property.[54]

---

47 Trial Tr. Vol. 1 130:10–13, 81:15–20, 127:15–19.

48 Trial Tr. Vol. 1 138:1–7.

49 Pretrial Order at ¶ 30; Trial Tr. Vol. 1 81:21–82:1.

50 Trial Tr. Vol. 1 82:2–5; *see also* Pretrial Order at ¶ 31.

51 Pretrial Order at ¶ 37.

52 Trial Tr. Vol. 1 86:2–12, 150:24–151:8.

53 Trial Tr. Vol. 1 151:4–8 (Debtor responds "No" when asked "[W]as there any source from meeting Wurk's business expenses, other than the funds that you provided in the ordinary course of the financing of that entity?").

54 Trial Tr. Vol. 1 152:4–153:6.

Gordon argues that these factors show a legitimate, albeit failed, business purpose behind the payments to Wurk TS. He also argues that the listed transfers occurred months before his hurried bankruptcy filing, and could not have been made strategically in anticipation of it.

The Court agrees. It cannot and does not find that the Wurk TS Transfer was made with the intent to hinder, delay or defraud creditors or a trustee.

But the Trustee also argues that Gordon made a false oath by not disclosing the Wurk TS Transfer on any version of his Statement of Financial Affairs. Gordon responds that Wurk TS was not a creditor, and that the Wurk TS Transfer was a capital contribution to Wurk TS in the ordinary course of his business. In support of this position, Gordon cites his routine financing of many startup businesses, and the fact that Wurk TS had no sources of capital other than him.[55] Alternatively, Gordon says that he understood the term "other property" in Question 10 of the Statement of Financial Affairs to refer to transfers of property other than cash.[56] On these bases, Gordon, says, he concluded that the payments were exempt from the reporting requirements of Questions 3 and 10 on the Statement of Financial Affairs.

The Court finds that Wurk TS was not a creditor—in fact, Wurk TS owes Gordon money—but that Gordon had no reasonable basis for the belief that the need to cover transfers of "other property" did not include transfers of cash. If Gordon had a history of transferring sums to Wurk TS—even if in amounts less than $500,000—the Court might then have found the Wurk TS Transfer to be in the ordinary course, but the record reflects no earlier transfers upon which the Court might make an ordinary course finding.

---

[55] Trial Tr. Vol. 1 151:4–8.

[56] Trial Tr. Vol. 1 154:2–7, 32:8–33:13 (Mar. 12, 2013).

Accordingly, the Court finds that the Wurk TS Transfer should have been disclosed. It was not, and thus the Court finds that with respect to it, Gordon made a false oath. It also finds that Gordon concealed the assets (debt or capital) resulting from the Wurk TS Transfer.

*B. Wurk Environments Transfer*

Gordon listed a $1.5 million payment to Wurk Environments (the "**Wurk Environments Transfer**") on his Amended Financial Affairs Statement. He changed that entry on his Second Amended Financial Affairs Statement, disclosing a larger $2.5 million in payments to Wurk Environments "and/or" Wurk TS. The Trustee argues that these payments, while properly disclosed,[57] were made with intent to hinder, delay, or defraud creditors. Gordon argues that these payments, like the Wurk TS Transfer, were made to fund Wurk's construction contract with Citadel, and thus served a legitimate business purpose.[58]

Again, the Court cannot find that Gordon made the Wurk Environments Transfer with the intent to hinder, delay or defraud creditors or a trustee, and thus disagrees with the Trustee in this respect.

*C. Wurk TS Receivable*

At the time of Gordon's bankruptcy filing, Wurk TS owed him $15,000 (the "**Wurk TS Receivable**") for expenses that Gordon incurred on behalf of that company. Yet Gordon did not list this receivable on his Initial Schedules. At some time in the ten days following Gordon's petition, Wurk TS paid him $15,000 to settle the receivable.[59] It wasn't until after the commencement of this adversary proceeding—in which the Trustee alleged the concealment of the Wurk TS Receivable—that Gordon filed his Amended Schedules, including the $15,000

---

57 The Trustee did not allege any false oaths in connection with the Wurk Environments Transfer, even though the transfer was excluded from Gordon's Initial Statement.

58 Trial Tr. Vol. 1 151:15–24.

59 Trial Tr. Vol. 1 83:17–84:6.

receivable. The Trustee demanded in an August 2011 letter that Gordon hand over the value of the receivable to the estate, but as of the time of trial he had not done so.[60]

At trial, Gordon blamed his accelerated bankruptcy filing, and the temporary denial of access to his bank records (which had been the target of identity theft), for initially failing to list the Wurk TS Receivable.[61] The Trustee counters that Wurk TS's payment of the receivable so shortly after Gordon's filing date evidences Gordon's intent to hinder, delay or defraud, as did Gordon's failure to update his Initial Schedules for many months after receiving that payment. Gordon did not update his Initial Schedules to include the Wurk TS Receivable until December 2010, even though it was repaid in October 2009 and the bank re-granted access to his records within about three months.[62]

Gordon argues that his failure to include this receivable was inadvertent, and that he had no reason to intentionally conceal it given that the Trustee had full access to his books and records and because the amount of the receivable was small in relation to his personal balance sheet. It would be absurd, Gordon argues, for him to have intentionally risked losing his discharge for an amount equal to 0.14% of his total stated assets.[63]

The Court agrees in part, but only in part. It cannot accept the notion that Gordon could have justifiably expected that the Trustee would discover the receivable on her own—especially based on Gordon's shoddily maintained books and records. But the Court is persuaded by the small size of the receivable in question. As with respect to the other Wurk transactions, the Court does not see anything to lead it to conclude that Gordon tried to hinder, delay or defraud

---

60 Pretrial Order at ¶ 36.

61 Trial Tr. Vol. 1 82:14–84:24.

62 Trial Tr. Vol. 1 83:17–84:24.

63 Debtor's Post-Trial Br. at 21 n.20.

creditors or a trustee with respect to this modestly sized receivable. And while $15,000 could very well be material in another case, it is modest in amount in this one. The Court sees insufficient evidence of intent on Gordon's part to conceal a receivable this small.

*8. Disclosing Debtor's Reported Income*[64]

Prior to his bankruptcy filing, Gordon earned income from wages, commissions, and in kind payments from several of his business affiliates. Gordon was required to provide information with respect to his income on his Schedules[65] and Statements of Financial Affairs.[66] The Trustee argues that Gordon understated his actual income with respect to each of the years 2009, 2008 and 2007.

*A. 2009 Income*

Gordon's Initial Schedules and Amended Schedules disclosed $33,908 in average monthly income, including $20,000 in payments in kind, from Rosedale Cooley Management ("**Rosedale Cooley**"), with total earnings for the period January 2009 through September 2009 of approximately $408,000. But Gordon's 2009 federal tax return showed that he also received $347,263 in commissions from Citadel, and $62,939 more in payments in kind from AllStar Capital.[67] Adding the Rosedale Cooley earnings to the AllStar Capital and Citadel income from

---

[64] The Trustee also alleged that Gordon failed to disclose a $157,978 tax overpayment due to him by the IRS on his Initial Schedules and Amended Schedules. Gordon defended this allegation by saying he relied on his bankruptcy counsel in omitting this asset, demonstrating a lack of fraudulent intent. The parties agreed to waive this sub-count in order to limit the disputed issues at trial. *See* Trial Tr. Vol. 1 4:25–5:19. Thus, the Court does not consider allegations regarding the tax overpayment in this decision.

[65] They require, in Schedule I, "Estimate of average or projected income at time case filed." *See* Official Form 6.

[66] They require, in Item 1, "Income from employment of operation of business," that the debtor "[s]tate the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced." They further require that the debtor "[s]tate also the gross amounts received ruing the two years immediately preceding this calendar year." Debtors that maintain records on a fiscal year basis may show their income on a fiscal year basis instead. *See* Official Form 7.

[67] Pretrial Order at ¶ 61.

Gordon's tax return, the Trustee argues that Gordon's actual income for 2009 was at least $635,000.

Gordon asserted at trial that the in kind payments and Citadel commissions included on his tax return were non-recurring payments that should not have been included on Schedule I, which requests "average or projected income at time case filed."[68] And he said that the in kind payments were a "one off" payment by AllStar Capital of some of his credit card bills.[69] Thus, he said, he could and did exclude the Citadel and AllStar Capital income from his Schedule I.

The Trustee also argued that Gordon did not disclose his real 2009 income on his Statements of Financial Affairs. On each of Gordon's Statements of Financial Affairs, he listed his 2009 year-to-date income as only $150,000. The Trustee noted that this figure was far less than the $635,000 appearing from his tax returns. Gordon countered that he approximated the figure using the reduced salary of $3,000 a week he was receiving at the time.[70] But that is not responsive to the information that Item 1 of the Statement of Financial Affairs requires.

Though income may not be as important as assets in a chapter 7 case (as contrasted, *e.g.* to a chapter 13 case), the Court finds the understatement of income—particularly in the Statements of Financial Affairs—to be very serious, and among the most serious of his many disclosure deficiencies. With full and complete disclosure, Gordon might have convinced the Court that his use of corporations and trusts as species of private piggy bank was benign. And with full and complete disclosure, he could have said that he did not think that past receipts were indicative of what he would make thereafter. But he did not let it all hang out. His dramatic understatement of the cash that he took in—without fuller disclosure, without footnoting, without

---

68 *See* Trial Tr. Vol. 1 171:2–14, 174:2–8.

69 Trial Tr. Vol. 1 171:10–14. This is simply one of many examples of the means by which Gordon used corporations he controlled as means to fund his lifestyle.

70 Trial Tr. Vol. 1 95:3–12.

explanation, without *anything*—painted a dramatically different picture of his financial condition. The Court finds the income misstatements to be amongst his most egregious. And it finds false oaths here.

*B. 2008 and 2007 Income*

Gordon listed his 2007 and 2008 income as *negative* $164,000 and $0, respectively, in response to Question 1 of the Statement of Financial Affairs. Though that question requires debtors to report *gross* income, a note by the 2007 figure indicated that it was "net of losses." Though the 2008 figure had no such note, Gordon claimed it also was net of losses.[71]

With respect to Gordon's 2008 income, the Trustee pointed to the disparity between Gordon's gross wages as reported on his tax return ($267,000), and what was supposed to be his gross income reported on his Statements ($0). This, the Trustee argued, was still another false oath. Gordon's response was that his 2008 tax return showed *net* income of negative $170,000. (He did not explain his failure to indicate, even by footnote, that the negative $164,000 income he showed on his Statement of Financial Affairs was a net number, though that might be the only reasonable inference.) He also argued that accurate information on his gross income for 2007 and 2008 was available to the Trustee elsewhere.

The Court disbelieves Gordon's testimony that his disclosure in that fashion was an honest mistake made in reliance on his bankruptcy attorney's advice.[72] The Trustee was right when she faulted Gordon for stating *net* income when Question 1 expressly required him to provide *gross* income, and the Court finds that failure inexcusable. But as nonresponsive and

---

71 *See* Trial Tr. Vol. 1 168:17–169:1; Trial Tr. Vol. 2 11:8–12; *see also* Trial Tr. Vol. 1 121:6–19. The Court does not find that credible, and also does not find it credible that an attorney representing a debtor with business affairs as sophisticated as Gordon's would not understand the difference between "gross" and "net."

72 Debtor's Post-Trial Br. at 23–24. Gordon argued that he and his attorney were trying to state income in a way that would match his tax returns, and realized only in hindsight that they used an erroneous method.

evasive as Gordon's Question 1 responses were, what he said has not been shown to be actually false. His responses were instead intentionally answering a different question, and intentionally failing to disclose what had been asked for.

* * *

Here there is not a concealment of an asset; the issue is solely one of false oath. With respect to 2009, the Court finds an egregiously false oath. But while the Court finds Gordon's game-playing with respect to his income in 2007 and 2008 to be strong evidence of his scienter with respect to his duties of disclosure, the Court does not find the requisite false statement with respect to those years.[73]

*9. Undisclosed Guaranty Obligations*

Gordon failed to include on Schedule H of his Initial Schedules four obligations for which he was a guarantor (collectively, the "**Guaranty Obligations**"). These were:

> (i) Rosedale Cooley's residential lease of 151 East 85th Street, Unit 10C, New York, where Gordon resided;[74]
>
> (ii) Citadel's loan for a 2008 Range Rover that Gordon frequently drove;[75]
>
> (iii) AllStar Capital's Signature bank loan; and
>
> (iv) Wurk Management's residential lease of 455 West 37th Street, Apt. 1111, New York, for the occupancy of Joseph DeTrano, Chief Operating Officer of Wurk TS.

After the Trustee identified these omissions in her complaint, Gordon amended his Initial Schedules to include them. So on the one hand, the disclosure failures were eventually

---

[73] There here is no transferring property claim.

[74] *See* Trial Tr. Vol. 1 101:4–102:23, 174:24–175:13 (Mar. 12, 2013); Trial Tr. Vol. 2 5:7–6:24 .

[75] *See* Pretrial Order at ¶¶ 62, 67. Gordon acknowledged this omission at the § 341 Meeting.

corrected. On the other, here there were four more instances of failures to disclose before his disclosure failures had been noted.

Gordon contended that he did not initially list these obligations because he was only a guarantor of them, and he thought Schedule H, which requires debtors to list "joint obligations," did not cover obligations a debtor only guarantied.[76] Gordon claimed that he thought these obligations were not "joint" in the sense that his liability was contingent on the principal borrower's ability to repay.[77] He also argued that his readiness to acknowledge these obligations at the 341 Meeting, and in response to the Trustee's inquiries, demonstrated a lack of fraudulent intent.[78] Gordon also argued that the failure to disclose the Guaranty Obligations was immaterial, because his estate never had to pay anything to satisfy them.[79]

But these explanations ring hollow (especially those other than the materiality contention) in light of what has become a pattern of failures to disclose until Gordon's disclosure failures were uncovered by other means. It appears to be true that Gordon's estate ultimately never had to make payment on the guaranty obligations, and that the creditors holding those guaranties ultimately were not prejudiced by the failures of disclosure. But the number and nature of these failures of disclosure, particularly in the context of the others, discussed above, make Gordon's various excuses for his failures to make appropriate disclosure unworthy of belief.

---

76 Trial Tr. Vol. 1 101:22–102:5.

77 Trial Tr. Vol. 1 102:10–15.

78 Trial Tr. Vol. 1 124:15–19; *see also* Stip. Exh. 54 (Transcript of Meeting of Creditors on February 25, 2010).

79 Debtor's Post-Trial Br. at 33.

*10. Undisclosed Affiliated Businesses*

Question 18 of the Statement of Financial Affairs requests information on the debtor's affiliated businesses. In response to Question 8 on the Initial Financial Affairs Statement, Gordon failed to list eight businesses: Citadel; Cascar, LP ("**Cascar**"); McCann Construction; Hilltop Investments, LLC ("**Hilltop Investments**"); Boulder Heights Owner, LLC ("**Boulder Heights**"); Phoenix Capital Advisors ("**Phoenix Capital**"); Eastern Energy Group ("**Eastern Energy**"); and King Holdings, LLC ("**King Holdings**").[80]

These entities were also unlisted on Gordon's Amended Financial Affairs Statement. After the Trustee identified these omissions in her complaint, Gordon included all but Citadel and Cascar on his Second Amended Financial Affairs Statement. Citadel and Cascar were never included on any version of Gordon's Statement of Financial Affairs.

*A. Entities Debtor never disclosed*

*1. Cascar*

Gordon formed Cascar in December 2005 to hold two valuable seats on the New York Mercantile Exchange ("**NYMEX**"), of which he was a member, so that he could transfer the seats to his then-wife as part of a separation agreement.[81] Gordon was the general partner of Cascar and initially owned a 98.5% interest in the partnership before effectuating the separation agreement.[82] Gordon argued that since his interest in Cascar was nominal and his duties were *pro forma*, he believed he was not required to list the entity and did not act fraudulently by omitting it.

---

80 Pretrial Order at ¶¶ 82, 84.

81 Stip. Exh. 48 (Agreement of Limited Partnership of Cascar, LP, dated December 5, 2005); Stip. Exh. 10 at ¶ 34; Trial Tr. 164:5–14 (Mar. 12, 2013). NYMEX rules forbade non-members from owning seats except through a partnership in which a member was the general partner. *See* Trial Tr. 164:7–9 (Mar. 12, 2013).

82 *See* Stip. Exh. 48 at 17; Stip. Exh. 49 (Separation agreement, dated on or about November 16, 2006) at 12.

The Court finds that here too, Gordon should have made the disclosure, knowingly failed to make it, and made a false oath in omitting Cascar from his Schedules.

*2. Citadel*

As noted above, Gordon owned an interest in Citadel indirectly through his position in Gordon Family I, which owned McCann Construction, which in turn owned between 50% and 100% of Citadel at the relevant times. At trial, Gordon testified that he believed he was not an officer of Citadel, which would exempt Citadel from Question 18's reporting requirement, and that he thought David Stack was Citadel's sole officer, a proposition Stack supported with "extensive documents."[83] But Gordon also testified that he had signed a construction bond on Citadel's behalf after the bonding company requested that he be Citadel's acting secretary.[84] On several other occasions Gordon signed as a "principal" of Citadel,[85] but he testified that he never meant the title to mean the same thing as owner or officer,[86] which would require listing Citadel in response to Question 18.

The Court finds that here too, Gordon should have made the disclosure, knowingly failed to make it, and made a false oath in omitting Citadel from his Schedules.

*B. Entities Debtor eventually disclosed*

Gordon eventually disclosed the other six entities the Trustee identified in her complaint on his Second Amended Financial Affairs Statement.

---

83 Trial Tr. Vol. 1 91:7–17 (Debtor never clarified the specific documents he was referring to).

84 Trial Tr. Vol. 1 91:11–14, 142:22–24; *see* Stip. Exh. 69 (Response to DASNY Questionnaire filed by Citadel Construction Corp. showing its ownership structure).

85 *See, e.g.*, Stip. Exh. 39 (Letter, dated January 15, 2008, regarding audit signed by Gordon on behalf of Citadel); Stip. Exh. 41(Unconditional Waiver and Release Upon Progress Payment signed by Gordon as principal of Citadel).

86 *See* Trial Tr. Vol. 1 182:7–15.

With respect to four of the entities Gordon first omitted but eventually disclosed, Gordon argues that he was never required to disclose them. Phoenix Capital had its name changed before the petition to Rosedale Cooley Management, which Gordon did disclose.[87] For Hilltop Investments and Eastern Energy, Gordon pointed to the Connecticut Secretary of State's website to show he was never an officer or manager of either company.[88] Gordon stated he ceased being an officer of King Holdings in 2002, when that entity was transferred to the U.S. government as part of a plea agreement, and because Question 18 looks back only six years, he was not required to list the company.[89]

For the remaining two entities, McCann Construction and Boulder Heights, Gordon claimed his failure to list them was inadvertent, and, in any event, the exclusion was immaterial since his positions in them were easily discoverable from information he did provide. Gordon listed Gordon Family I and AllStar Capital on his disclosures, and Gordon Family I and AllStar Capital were owners of McCann Construction and Boulder Heights, respectively.[90] Consequently, Gordon claimed he made his indirect positions in those companies plain to see and was not acting fraudulently.

The failures to list Phoenix Capital, Hilltop Investments, Eastern Energy and King Holdings are understandable; the failures to list the other two are not. Once more, they evidence Gordon's pattern of failures to disclose until circumstances require him to do so.

---

87 Trial Tr. Vol. 1 162:17–23.

88 Trial Tr. Vol. 1 160:8–15, 162:24–163:13; *see also* Stip. Exh. 61 (Printout from Connecticut Secretary of State website concerning Hilltop Investments, LLC); Stip. Exh. 62 (Printout from Connecticut Secretary of State website concerning Eastern Energy Group, Inc.).

89 Trial Tr. Vol. 1 163:14–23.

90 Trial Tr. Vol. 1 159:18–160:7, 161:12–20.

*11. Disclosing Payments to Creditors within 90 Days of Filing*

Question 3(b) of the Statement of Financial Affairs requires disclosure of payments made to creditors in the 90 days preceding the bankruptcy. The Trustee alleged that Gordon failed to list payments of that character in his Initial Financial Affairs Statement, and that this failure constituted a false oath. Specifically, the Trustee alleged that Gordon did not include payments made to American Express totaling at least $36,150.

Gordon eventually added a $22,343 payment to American Express on his Second Amended Financial Affairs Statement. He testified that he did not include the American Express payment previously because he thought it was for a corporate card, but once he realized he had made the payment in his personal capacity, he listed it.[91]

Once again, the American Express episode evidences Gordon's pattern of nondisclosure, until and unless his disclosure failures have already become apparent, and his failures to take his disclosure obligations seriously. Nevertheless, with respect to this one, the Court accepts Gordon's explanation and finds his exclusion of the payments to American Express to be innocent mistakes or, at worst, sloppiness.

*12. Disclosing Other Transfers within Two Years of Filing*

Statement of Financial Affairs Question 10(a) requests information on all other transfers made in the two years prior to the debtor's bankruptcy filing. Gordon did not list two transfers in response to that question on his Initial Financial Affairs Statement and Amended Financial Affairs Statement:

---

[91] Trial Tr. Vol. 1 157:4–158:10. Gordon also listed a number of transfers in amounts less than $5,475, which he was not obligated to include.

(i) a $49,000 IRA contribution to Charles Schwab for the period January 2008 to May 2008; and

(ii) a $25,000 payment to Wachovia Bank to pay down a home equity line of credit.

Gordon testified that he did not include these transfers because he believed "other transfers" referred to non-cash transfers, and because he thought they were in the ordinary course of his business.[92] Eventually, Gordon included these payments in his Second Amended Financial Affairs Statement.

* * *

These transfers should have been disclosed. Once again, it appears that Gordon chose not to make appropriate disclosure. And for reasons discussed above, the Court does not consider either explanation satisfactory. The Court finds a false oath here.

*13. Listing Pending Lawsuits*

Question 4 of the Statement of Financial Affairs requires the listing of suits or administrative proceedings to which the debtor is or was a party within the year before the filing of the petition. Gordon did not list a lawsuit, *AG/Woo Centre Street Owner, LLC as Counterclaim Plaintiff v. Hanover Insurance Company, et al.*, which was pending in the Supreme Court of the State of New York at the time of Gordon's petition,[93] until he filed his Second Amended Financial Affairs Statement. But that lawsuit contained no claim against Gordon until a counterclaim was filed, and the parties stipulated that Gordon had not been served with the counterclaim as of his petition date, although his attorney had received a copy of it.[94]

---

92 Trial Tr. Vol. 1 158:11–159:8.

93 Pretrial Order at ¶¶ 90–91.

94 Pretrial Order at ¶¶ 97, 98.

The Trustee alleged in her complaint that Gordon made a false oath by failing to include this suit in his Initial Financial Affairs Statement or his Amended Financial Affairs Statement, but did not question Gordon about the omission during trial or mention it in her post-trial brief.

The Trustee has not pursued this claim, and the Court does not find that Gordon made a false oath by failing to list this lawsuit.

## Discussion

## I.

## The Underlying Law

The Court first turns to the underlying law, omitting aspects of it that are not relevant here.

Critical to all of it is a central purpose of the Bankruptcy Code, which is to give the "honest but unfortunate debtor"[95] a fresh start in life without the burden of old debts. Section 727 of the Code, which governs discharge, achieves that purpose by providing that "[t]he court *shall* grant the debtor a discharge, *unless*" one of section 727(a)'s enumerated grounds for denial of a discharge is proven.

The Code thus creates a strong presumption in favor of granting a discharge. Consequently, denial of a discharge is an extreme remedy, and section 727 must be construed strictly against any who object to the debtor's discharge.[96]

---

95 *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

96 *See D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 234 (2d Cir. 2006) ("***Cacioli***"); *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 662 (Bankr. S.D.N.Y. 2008) (Glenn, J.) ("***Gardner***") ("[A] denial of discharge pursuant to § 727 is characterized as an extreme remedy that must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt.") (quoting *Cacioli*).

*A. Section 727(a)(2): Concealing or transferring property*

The text of section 727(a)(2) appears above.[97] By its terms, to prove a violation of section 727(a)(2), a creditor or a trustee must show both an act (i.e., transferring or concealing) and an improper intent. The statute requires *actual* intent to hinder, delay, or defraud creditors or the trustee.[98] Constructive intent to defraud does not suffice.

Whether a debtor had fraudulent intent is a question of fact. A debtor's intent can be shown directly or, more commonly, inferentially from the debtor's course of conduct and the surrounding circumstances.[99]

"Badges of fraud" have frequently been used as circumstantial evidence to ascertain whether a debtor had fraudulent intent in making transfers alleged to hinder, delay or defraud creditors.[100] The "badges" are commonly recognized signals that a transaction may be fraudulent. They include:

> (1) the lack or inadequacy of consideration;
>
> (2) the family, friendship or close associate relationship between the parties;
>
> (3) the retention of possession, benefit or use of the property in question;
>
> (4) the financial condition of the party sought to be charged both before and after the transaction in question;
>
> (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

---

[97] *See* n.2 above.

[98] *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 570 (Bankr. S.D.N.Y. 2005) (Drain, J.) ("***Klutchko***").

[99] *Klutchko*, 338 B.R. at 570.

[100] *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983) ("***Kaiser***")).

(6) the general chronology of the events and transactions under inquiry.[101]

Additionally, the *Kaiser* court considered another factor: "[t]he shifting of assets by the debtor to a corporation wholly controlled by him."[102] The badges can be applied in determining whether the debtor concealed or transferred assets, but many of the badges are more applicable in the transfer context.[103]

*B. Section 727(a)(4)(A): False oaths and accounts*

The text of section 727(a)(4) appears above.[104] Courts have interpreted section 727(a)(4)(A) to require proof of five elements—that:

(1) the debtor made a statement under oath,

(2) such statement was false,

(3) the debtor knew the statement was false,

(4) the debtor made the statement with the intent to defraud creditors, and

(5) the statement related materially to the bankruptcy case.[105]

The first and second elements require that the debtor have made a statement under oath, and that the statement was false. Bankruptcy schedules and the Statement of Financial Affairs ("**SOFA**") are statements under oath for the purpose of section 727.[106] Both affirmative

---

101 *Kaiser*, 722 F.2d at 1582–83.

102 *Id.* at 1583 (citing *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941)).

103 *See Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 440 (S.D.N.Y. 1996) (Batts, J.) ("***Gollomp***") (while applying the badges to a concealment of property allegation under section 727(a)(2)(A), stating that "[m]any of these 'badges' apply more appropriately to transfers").

104 *See* n.7 above.

105 *Fraleigh v. Fraleigh (In re Fraleigh)*, 474 B.R. 96, 104–05 (Bankr. S.D.N.Y. 2012) (Morris, C.J.) ("***Fraleigh***") (citing *Klutchko*, 338 B.R. at 567); *Prisivko v. Malakhov (In re Malakhov)*, 2011 WL 65603, at *4, 2011 Bankr. LEXIS 96, at *13 (Bankr. S.D.N.Y. Jan. 7, 2011) (Gropper, J.) (citing *Gollomp*, 198 B.R. at 437)).

106 *Gardner*, 384 B.R. at 667.

misstatements and omissions can qualify as false statements.[107] The third element, requiring that the debtor knew that the statement was false, precludes inadvertent misrepresentations, or instances of mere carelessness or ignorance, from violating the statute.[108] The court may consider the debtor's education and business experience in deciding whether he or she knew a statement to be false.[109]

Fourth, the debtor must have made the false statement with intent to defraud. As under section 727(a)(2), actual fraudulent intent, not constructive intent, is required.[110] But as discussed above, actual intent may be proven by circumstantial evidence, since a debtor is unlikely to testify that his or her intent was fraudulent.[111] And a showing that the debtor "displayed a reckless indifference to the truth" may be sufficient to establish the fraudulent intent necessary to deny the debtor's discharge pursuant to section 727(a)(4).[112]

---

107 *Forrest v. Bressler (In re Bressler)*, 387 B.R. 446, 460 (Bankr. S.D.N.Y. 2008) (Gonzalez, J.) ("***Bressler***").

108 *See Gardner*, 384 B.R. at 667 ("Intent under this section can be found based on a reckless disregard, but will not be found in cases of ignorance or carelessness.").

109 *See McCarthey Investments LLC v. Shah (In re Shah)*, 2010 WL 2010824, at *6, 2010 Bankr. LEXIS 1621, at *18–19 (Bankr. S.D.N.Y. May 13, 2010) (Bernstein, J.) ("***Shah***") ("[G]iven [Debtor]'s education, level of financial sophistication and appreciation of the significance of financial disclosure, the numerous misstatements depict a pattern which supports a finding of recklessness amounting to fraudulent intent."); *Zitwer v. Kelly (In re Kelly)*, 135 B.R. 459, 463 (Bankr. S.D.N.Y. 1992) (Brozman, J.) ("***Kelly***") ("a debtor's education and business experience are factors to consider in determining whether he can appreciate what information must be disclosed"); *In re Robinson*, 506 F.2d 1184, 1187 (2d Cir.1974) (in sustaining objections to the debtors discharge, the court considered whether the debtor understood the questions being asked of him).

110 *Fraleigh*, 474 B.R. at 105.

111 *Klutchko*, 338 B.R. at 570; *Bressler*, 387 B.R. at 461.

112 *Gollomp*, 198 B.R. at 438 ("A Debtor shall be denied a discharge if he is found to have exhibited a "reckless indifference to the truth." The Second Circuit has recognized that fraudulent intent may be inferred from a series of incorrect statements contained in the schedules.") (citing *Nisselson v. Wolfson (In re Wolfson)*, 139 B.R. 279, 288–89 (Bankr. S.D.N.Y. 1992) (Lifland, C.J.) ("***Wolfson***") (finding that the debtor's inconsistent testimony regarding his ownership of several corporations displayed a reckless indifference to the truth that collectively amounted to fraudulent intent sufficient to deny the debtor's discharge pursuant to section 727(a)(4)), *aff'd*, 152 B.R. 830 (S.D.N.Y. 1993) and *Kaiser*, 722 F.2d at 1583 n.4)); *see also Fraleigh*, 474 B.R. at 105 ("Fraudulent intent must be shown by actual, not constructive fraud, although a 'reckless indifference to the truth' also suffices." (quotation marks omitted) (citing *In re Klutchko*, 338 B.R. at 567)); *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 316–17 (Bankr. E.D.N.Y. 1991) (Duberstein, C.J.) ("***Sapru***") ("It is also widely recognized that reckless indifference to the truth is the equivalent of fraud.") (citing *In re Diorio*, 407 F.2d 1330, 1331 (2d Cir. 1969) (debtor denied discharge

Although ignorance or carelessness alone is not sufficient to establish fraudulent intent,[113] multiple smaller falsehoods can aggregate into a "critical mass" that does indicate the requisite intent.[114] Multiple omissions may also indicate fraudulent intent if there is something about the omitted information the debtor might have wanted to conceal.[115]

Importantly, and in contrast to section 727(a)(2), the debtor's intent to defraud under 727(a)(4)(A) does *not* need to be directed at creditors or a trustee.[116] Rather, it is sufficient that the debtor knows what is true and, so knowing, intentionally or recklessly swears to what is false.[117]

Fifth and finally, the debtor's statement must relate materially to the bankruptcy. The determination of materiality turns, in part, on whether the debtor's "statement" was a false oath or an omission.[118] A false oath is an affirmative misstatement by the debtor, in his schedules, SOFA or during examinations, that relates to a material matter.[119] Materiality depends on

---

due to an admittedly false statement by the debtor in debtor's schedules and at the first meeting of creditors)).

[113] *Gollomp*, 198 B.R. at 437 (citing *Kelly*, 135 B.R. at 461 and *MacLeod v. Arcuri (In re Arcuri)*, 116 B.R. 873, 885 (Bankr. S.D.N.Y. 1990) (Berk, J.) ("***Arcuri***")).

[114] *Bressler*, 387 B.R. at 462.

[115] *See Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564–565 (Bankr. S.D. Cal. 1996) (Bowie, J.) ("there must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate" through his multiple omissions).

[116] It is apparent from the plain language of the statute that section 727(a)(4), which denies the debtor a discharge when the debtor "knowingly or fraudulently, *in or in connection with a case*, . . . made a false oath or account," (emphasis added), does not require that the debtor have the intent to hinder, delay, or defraud a specific creditor or office of the estate as is required by section 727(a)(2), which denies the debtor a discharge when the debtor "with an intent to hinder, delay or defraud *a creditor or office of the estate*" transferred or concealed property of the estate. (emphasis added). *See also* 6 *Collier on Bankruptcy* ("***Collier***") ¶ 727.04 (16th ed. rev. 2013).

[117] *In re Kaufhold*, 256 F.2d 181, 185 (3d Cir. 1958).

[118] *See Gardner*, 384 B.R. at 667 (stating that in addition to false oaths, "[o]missions from the debtor's schedules are equally recognized as generating liability under [section 727(a)(4)(A)]," although describing different standards to determine the materiality of each) (citations omitted)); *Shah*, 2010 WL 2010824, at *3, 2010 Bankr. LEXIS 1621, at *9 ("both omissions and affirmative misstatements can constitute false statements under § 727(a)(4)(A)"); *Bressler*, 387 B.R. at 460 (same).

[119] *See* 6 *Collier* ¶ 727.04.

whether the information is pertinent "to the debtor's business transactions, or if it concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property."[120] Upon a finding of materiality, the matter to which the false oath relates must have a non-trivial effect on the estate. A false statement that has little to no effect in the case—e.g., the misstatement is regarding property in which the estate does not have an interest, or the misstatement does not significantly affect the value of the estate or lead to the discovery of information that would affect the value of the estate—is not a ground for discharge.[121]

Omissions from the debtor's schedules, SOFA or testimony are material if they adversely impact the trustee's ability to discover other assets, fully investigate the debtor's pre-bankruptcy dealings and financial condition, or discover potential preference or fraudulent transfer actions.[122] Omissions that do not affect the value of the estate may nevertheless be material to the extent the omissions hindered the trustee's or creditor's ability to discover other assets or to investigate the debtor's pre-bankruptcy dealings and financial condition, even if such an investigation would not have benefited creditors.[123] Consequently, the debtor cannot decide what is material to the value of the estate and what is not, and a lack of intent to frustrate creditors does not necessarily defeat materiality.[124] A multitude of individually immaterial omissions may, in the aggregate, be considered material.[125]

---

[120] *See Gardner*, 384 B.R. at 667 ("Materiality is found if the false oath is related to the debtor's business transactions, concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property" (citing 6 *Collier* at ¶ 727.06–07)).

[121] *See* 6 *Collier* ¶ 727.04.

[122] *See Gardner*, 384 B.R. at 667 ("Omissions are material if they impact the trustee's ability to discover other assets, fully investigate pre-bankruptcy dealings, financial condition, and discovery of preference or avoidance actions.") (citing 6 Collier at ¶ 727.06–07).

[123] *See* 6 Collier ¶ 727.04 (citing *In re Robinson*, 506 F.2d 1184 (2d Cir. 1974), for the proposition that materiality does not require a showing that the creditors were prejudiced). *See also Robinson*, 506 F.2d at 1188.

[124] *See Bressler*, 387 B.R. at 461 ("[Debtor]'s discharge is denied in a large part because he essentially assumes a trustee's role of deciding what information is relevant or material, and thus undercuts the central

## II.

## Conclusions re Denial of Discharge

In the context of its Findings of Fact and the underlying law, both as set forth above, the Court does not find any of the Debtor's transfers to have been made with the intent to hinder, delay or defraud creditors or a trustee. Thus the Court determines that the Trustee failed to meet her burden to show that Gordon should be denied a discharge under the "transfers" prong of section 727(a)(2). But while the Court has also found that the Trustee failed to establish some of her concealment and false oath claims, under sections 727(a)(2) and (a)(4), respectively, she established more than a few of the remainder. And those she established were material. Thus, as a consequence of the latter, the Court must deny Gordon a discharge.

### *A. The 727(a)(2) Transfer Claims*

The Court's Findings of Fact preclude basing a denial of discharge by reason of Gordon's transfers. The evidence, especially taken as a whole, establishes that what Gordon did wrong was not in making the transfers he did. Rather, it was as a result of failing to disclose the assets and/or receivables that resulted from his making the transfers. Looking at the badges of fraud

---

principles of chapter 7 . . . ."); *Klutchko*, 338 B.R. at 568 (finding that "[g]enerally . . . it is not for the debtor to determine which assets should be disclosed to creditors," and "[t]he debtor's duty is merely to answer truthfully. It is left to the creditors or parties-in-interest to judge whether that information will aid them or prejudice them"); *see also Sapru*, 127 B.R. at 315–316 ("the determination of relevance and importance of the question is not for the Debtor to make. It is the Debtor's role simply to consider the question carefully and answer it completely and accurately.") (internal quotation marks omitted); *Bensenville Community Center Union v. Bailey (In re Bailey)*, 147 B.R. 157, 163 (Bankr. N.D. Ill. 1992) ("[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate.") (quoting *Matter of Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992)); *cf. In re Gugliada*, 20 B.R. 524, 528 (Bankr. S.D.N.Y.1982) (Schwartzberg, J.) (finding that "it is not for the debtor to determine which assets should be disclosed to his creditors," but not faulting the debtor for forgetting to mention securities of a long-inactive corporation that were "absolutely worthless" and which the creditors seeking denial of the debtor's discharge knew were worthless).

[125] *See Bressler*, 387 B.R. at 461–62 (holding that "otherwise immaterial falsehoods or omissions can aggregate into a critical mass substantial enough to bar a debtor's discharge") (citing *Sapru*, 127 B.R. at 315–16 ("It is this Court's decision that even if each falsehood or omission considered separately may be too immaterial to warrant a denial of discharge pursuant to § 727(a)(4)(A) certainly the multitude of discrepancies, falsehoods and omissions taken collectively are of sufficient materiality to bar the Defendant's discharge.")).

Case 4:25-cv-02017 Document 1-15 Filed 05/05/25 in TXSD Page 39 of 41

discussed above,[126] the only one appearing here is that the assets were often shifted by the debtor to corporations wholly controlled by him. And evidence of the most important of the other badges, transfers in the face of creditor pressure, was here lacking. There was here no evidence suggesting that Gordon made the transfers he did with the intent of keeping his assets away from creditors.

*B. The 727(a)(2) Concealment and 727(a)(4) False Oath Claims*

But with respect to the Trustee's claims under sections 727(a)(2), alleging concealment of assets, and 727(a)(4), alleging false oaths, the Court finds that the Trustee met her burden to justify denial of discharge in several respects. The Court has found that Gordon concealed receivables of $2 million arising from his advance to AllStar Capital; $650,000 to Citadel Construction; and $500,000 to Wurk TS. Concealment of these receivables, totaling over $3.1 million in the aggregate, was material. And the failures were not inadvertent. Discharge must be denied by reason of that concealment.

Likewise, the Court has found false oaths with respect to the concealment of the $2 million AllStar Capital Transfer and corresponding receivables; the $650,000 in transfers to Citadel, and corresponding receivables; and the $500,000 transfer to Wurk TS.[127] And the Court has likewise found false oaths with respect to Gordon's misstatement of his 2009 income (omitting several hundred thousands of dollars of income); his failure to disclose to investments in Cascar and Citadel; and his $49,000 IRA contribution and his $25,000 payment to Wachovia. And once again, these failures to disclose were material, and the failures to make the required disclosures were not inadvertent.

---

126 *See* page 32 above.

127 Even assuming that the latter was a capital contribution and not a loan, it still needed to be disclosed.

Particularly in the aggregate, the failures of disclosure are inexcusable. Discharge must be denied by reason of these false oaths.

## Conclusion

The Court's conclusions with respect to the evidence appear in the table below:

| **Subject of Claims** | **Established Concealing Property?** | **Established Transferring With Intent to Hinder, Delay or Defraud?** | **Established False Oath?** |
|---|---|---|---|
| AllStar Capital | Yes | No | Yes |
| Citadel Construction | Yes | No | Yes |
| McCann Construction | No | No | No |
| Wurk Entities | Yes, re Wurk TS Transfer, Wurk Environments; No re Wurk TS | No | Yes, re $500,000 Wurk TS Transfer, No re Wurk Environments and Wurk TS $15,000 Receivable |
| Reported Income | Not Applicable | Not Applicable | Yes, re 2009; No, re 2007 and 2008 |
| Affiliated Businesses | Not Applicable | Not Applicable | Yes re Cascar, Citadel; No re Phoenix Capital, Hilltop Investm., Eastern Energy and King Holdings |
| Disclosing Payments to Creditors | Not Applicable | Not Applicable | No |
| Disclosing Other Transfers Within 2 Yrs of Filing | Not Applicable | Not Applicable | Yes |
| Listing Pending Lawsuits | Not Applicable | Not Applicable | No |

By reason of the concealment of property and false oaths where the Trustee established her claims, discharge here must be, and is, denied.

The Trustee is to settle a judgment consistent with this Decision.

Dated: New York, New York
January 13, 2015

*s/Robert E. Gerber*
United States Bankruptcy Judge